797 So.2d 503 (2000)
Corey Schriod SMITH
v.
STATE.
CR-95-0205.
Court of Criminal Appeals of Alabama.
August 25, 2000.
Rehearing Denied October 20, 2000.
*509 Lee Sims, Dadeville; and Palmer Singleton, Atlanta, Georgia, for appellant.
Bill Pryor, atty. gen.; and Thomas F. Parker IV and Jack W. Willis, asst attys. gen., for appellee.
McMILLAN, Judge.
The appellant, Corey Schriod Smith, was convicted of murdering Kimberly Ann Brooks during the course of a kidnapping, an offense defined as capital by § 13A-5-40(a)(1), Ala.Code 1975. The jury unanimously recommended that Smith be sentenced to death. The trial court accepted the jury's recommendation and sentenced Smith to death by electrocution.
The State's evidence tended to show the following. On February 24, 1995, Tallapoosa police discovered the charred body of Kimberly Brooks rolled in a carpet; the carpet was lying beside a dirt road in Bibb Town. The coroner testified that Brooks had been shot in the head and the stomach and that there was soot in her lungs and trachea; he testified that she died of the "shots to the head [and] the chest and possible asphyxiation and burning."
Smith handwrote the following confession for the police:
"Kim came to the house around 7:30 a.m. Wednesday morning with Labreasha Main. We was talking about getting married later on. My brother Reginald came and Main left. After awhile, Reginald left.
"When my mamma got off work, me and Kim got into an argument about another girl calling me. We went outside. I pulled my gun on her. Sanjay [Brooks] and Shontai [Smith] pulled up. I forced her into the van. I told Sanjay to go to Bibb Town, which he did. And, when we got there, Kim and I got out, continuing arguing.
"I told her I love her, and if I couldn't have her, no one could. She told me she loved me but things weren't the same. I kissed her on the forehead and pushed her off me and shot her in the chest. And then she fell to the ground, and I shot her again toward her head.
"Shontai got out and helped me drag her into the bushes. We left. Sanjay dropped us off into the soft sands. When he returned, we got James Shealey['s] car and got some gas and went back where I left her. When we got there, she was standing up, and she got in the car and sat besides me. I was scared.
"Sanjay rode from Bibb Town to Reeltown looking for a place to set her on fire and bury her. I asked her what would she say if I took her to the hospital. She say, `I'm going to say Corey shot me.' We returned back to Bibb Town, and Sanjay drop us offdropped us off. He told us to go ahead and finish her and he'll be back.
"We put a trash bag over her face until she died. I poured the gas on her, and Shontai lit the lighter. Sanjay never returned.
"We left there and walked back to my house. Shontai spent the night. The next [day] he left and I never saw him again."
Smith's codefendants, Sanjay Brooks and Shontai Smith, Smith's cousins, pleaded guilty to murder and to kidnapping and received life sentences in exchange for *510 their trial testimony against Smith. Brooks was sentenced to concurrent life sentences on each count and Shontai Smith was sentenced to two consecutive life sentences. Both codefendants testified at trial and corroborated Smith's statement. Shontai Smith further testified, concerning setting Brooks's body on fire, that after he and Smith poured gasoline on Brooks and ignited her, the fire got out of control; to stop it they threw sand on Brooks's body. The two then placed her body in a piece of carpet that had been left in the dump area and rolled her body in the carpet.
Two other witnesses testified that on the day of the murder Smith told them that he had killed Kimberly. One witness, Larry Butler, testified that Smith told him that he had killed Kimberly and that he needed gasoline to dispose of her body.
Because Smith was sentenced to death, this Court is obligated, pursuant to Rule 45A, Ala.R.App.P., to review the record of the trial for plain error. Rule 45A, Ala. R.App.P., defines "plain error" as follows:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
As this Court stated in Tyson v. State, 784 So.2d 328, 333 (Ala.Crim.App. 2000):
"Error is `plain' if `the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' Haney v. State, 603 So.2d 368 (Ala.Cr. App.1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Also, `[T]he plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."' United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). To find plain error `the claimed error [must] not only [have] seriously affected [the defendant's] "substantial rights," but ... it [must have] had an unfair prejudicial impact on the jury's deliberations.' Young, 470 U.S. at 18 n. 14[, 105 S.Ct. 1038]."

I.
Smith argues that the trial court erred in not quashing his indictment because, he alleges, there was gender discrimination in the selection of the grand jury foreperson in Tallapoosa County.[1] Smith argues that he met his burden of establishing a prima facie case of gender discrimination and that the State failed to rebut this evidence. Smith also asserts that this alleged discrimination is all the more "repugnant" because of the important and vital role that the grand jury foreperson performs.
Initially, we observe that the Alabama Supreme Court has characterized the role of an Alabama grand jury foreperson as "primarily ministerial." Ex parte Myers, 699 So.2d 1285 (Ala.1997), cert. denied, 522 U.S. 1054, 118 S.Ct. 706, 139 L.Ed.2d 648 (1998). "[T]he role of a grand jury foreperson in Alabama is so ministerial that even his or her failure to *511 participate in deliberations and to vote with the panel is not fatal to the indictment if the requisite 12 members of the panel concur in the indictment." Ex parte Pace, 714 So.2d 332, 338 (Ala.1997), opinion on remand, 714 So.2d 340 (Ala.Crim. App.1998), cert. denied, 523 U.S. 1051, 118 S.Ct. 1372, 140 L.Ed.2d 520 (1998). The Alabama Supreme Court in Pace refused to find plain error in the discriminatory selection of a foreperson of an otherwise properly constituted grand jury because the role of the foreperson in almost entirely ministerial.
This Court held in Lee v. State, 631 So.2d 1059 (Ala.Crim.App.1993), and Locke v. State, 631 So.2d 1062 (Ala.Crim.App. 1993), that in order to establish a prima facie case of racial discrimination in the selection of a grand jury foreperson, the defendant must show: (1) that the group alleged to be discriminated against is a distinct group; (2) that the degree of under representation is significant over a period of time; and (3) that the selection procedure is susceptible to abuse or is not race-neutral. We note that this Court has used this test when determining whether there was gender discrimination in the selection of a grand jury foreperson. Minor v. State, 780 So.2d 707 (Ala.Crim.App. 1999). Once the defendant has established a prima facie case of discrimination, the burden then shifts to the State to rebut this evidence. Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979).
At the hearing on the pretrial motion to dismiss, Smith presented evidence that from spring 1990, until Smith was indicted in spring 1995, 11 grand juries were convened in Tallapoosa County.[2] Of the 11 grand juries convened, two had forepersons who were womenspring 1992 and one in fall 1993. Smith also submitted the 1990 census for Tallapoosa County. This census reflected that in 1990 women over the age of 18 made up 54% of the population in Tallapoosa County. There was also a stipulation at the hearing that the grand jury forepersons were selected by the local circuit court judges, sometimes with the advice of the district attorney.
Certainly, women constitute a distinct group in Tallapoosa County and Smith's evidence showed that 2 women had been selected as forepersons out of the 11 grand juries that had convened in the period he reported on. The foreperson of Smith's grand jury was male. However, Smith did not meet the third prong of the Lee and Locke test. Although there was a stipulation as to how foreperson were generally selected in Tallapoosa County Smith did not present evidence as to how the grand jury foreperson who presided over the grand jury that indicted him was selected. There was evidence presented that the presiding judge did not always follow the district attorney's recommendation and that the judge would, on occasion, select the grand jury foreperson himself. However, there was no indication how the grand jury foreperson for Smith's grand jury was chosen. Neither was there evidence as to the criteria that the judge used in selecting the grand jury foreperson. There was no evidence that the standards by which the judges chose grand jury forepersons were discriminatory. Also, defense counsel at the hearing admitted that he did not know the gender composition of Smith's grand jury.
*512 As this Court stated in Drinkard v. State, 777 So.2d 225, 243 (Ala.Crim.App. 1999):
"[T]he appellant did not establish that there was any discrimination in the selection of the foreperson of the grand jury that indicted him. The racial composition of the grand jury is not evident from the record. It would be sheer supposition to conclude that an African American served on the grand jury that indicted the appellant, and that he or she was not selected to serve as foreperson solely because of racial discrimination in the selection process.... Even if we were to assume for the sake of argument that racial discrimination played a part in the selection of the grand jury foreperson, the appellant did not establish that the discriminatory selection changed the composition of the grand jurythe foreperson was chosen from among the members of the grand juryor that the foreperson of the grand jury that indicted him exercised more than a ministerial role."
Moreover, there is some question as to whether Smith furnished correct statistical information when attempting to satisfy the second prong of the Lee and Locke test. As the Louisiana Court of Appeals stated in State v. Guillory, 715 So.2d 400, 413-14 (La.Ct.App.), writ denied, 726 So.2d 17 (La.1998):
"[S]ince the general venire in East Baton Rouge Parish is composed of `qualified' persons drawn from a random list of registered voters and licensed drivers in that parish, the total percentage of a particular minority in the general population does not have a direct bearing on the make-up of the general venire, from which the grand jury venire is randomly drawn, and the grand jury foreman is selected. Rather, it is the percentage of the particular minority in the general population who are either licensed drivers or registered voters, and who meet the five qualifications necessary to become a juror, which is the appropriate percentage to compare with the actual percentage of minority grand jury foremen.

"Therefore, in order to make a prima facie showing of discrimination in the selection of a grand jury foreman, the defendant must show a disproportion over a significant period of time between the percentage of an identifiable minority in the general venire or grand jury venire, and the percentage of minority forepersons during that time; and that the selection process is susceptible of abuse. That is, the defendant must show that the percentage of minority persons in the general population who are qualified to serve as grand jurors is disproportionate to the actual number of minority grand jury forepersons over a significant period of time to establish a prima facie case. Alexander v. Louisiana, 405 U.S. 625, 630, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536 (1972); Newman v. Henderson, 539 F.2d 502, 505 (5th Cir.1976), cert. denied, 433 U.S. 914, 97 S.Ct. 2986, 53 L.Ed.2d 1100 (1977); Preston v. Mandeville, 428 F.2d 1392 (5th Cir.1970); Labat v. Bennett, 365 F.2d 698 (5th Cir.1966), cert. denied, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967); see also, Foster v. Sparks, 506 F.2d 805, 832-33 (5th Cir.1975); United States v. Jenison, 485 F.Supp. 655, 663 (S.D.Fla.1979). To hold otherwise would be to ignore the fact that a substantial percentage of the general population does not meet the five qualifications which must be met in order to serve on a jury, or in this case as grand jury foreman.

"In this case the defendant failed to show the percentage of minority persons in the general or grand jury venires, or *513 the percentage of qualified minority persons in the general population[;] therefore[,] the trial judge was correct in finding that the defendant had not made the required prima facie showing. This assignment lacks merit."

(Emphasis in original.) In this case, Smith failed to establish a prima facie case of gender discrimination; thus, the burden never shifted to the State to rebut the evidence Smith presented. Rose v. Mitchell, supra.

II.
Smith argues that the trial court erred in denying his motion to dismiss the indictment because, he says, the indictment was vague, duplicitous, multiplicitous, and improperly drawn according to § 15-8-50, Ala.Code 1975.
Smith and his codefendants, Shontai Smith and Sanjay Brooks, were each indicted for two counts of capital murder. Count I of the indictment read as follows:
"The Grand Jury of said County charge that before the finding of this indictment Corey Schriod Smith, alias... Shontai Monguell Smith, alias ... and Antonio Sanjay Brooks, alias ... the true or Christian names of whom being otherwise unknown to the Grand Jury, did intentionally cause the death of Kimberly Brooks, by shooting her with a pistol or gun, a further description of which is otherwise unknown to the Grand Jury, by suffocating her with a plastic bag, a further description of which is otherwise unknown to the Grand Jury, and/or by setting her on fire, and Corey Schriod Smith, Shontai Monguell Smith, and Antonio Sanjay Brooks caused said death during Corey Schriod Smith's, Shontai Monguell Smith's and Antonio Sanjay Brooks' abduction of, or attempt to abduct, Kimberly Brooks with intent to inflict physical injury upon her, or to violate or abuse her sexually, in violation of Section 13A-5-40(a)(1) of the Code of Alabama, against the peace and dignity of the State of Alabama."
Count II of the indictment read, in part, that Smith and his codefendants
"[d]id intentionally cause the death of Kimberly Brooks, by shooting her with a pistol or gun, a further description of which is otherwise unknown to the Grand Jury, by suffocating her with a plastic bag, a further description of which is otherwise unknown to the Grand Jury, and/or by setting her on fire, and ... caused said death during... abduction of, or attempt to abduct, Kimberly Brooks with intent to accomplish or aid the commission of murder, a felony, or flight therefrom, in violation of Section 13A-5-40(a)(1) of the Code of Alabama, against the peace and dignity of the State of Alabama."
The Court dismissed Count II of the indictment on the State's motiononly Count I was submitted to the jury.[3]

A.
Smith first argues that the indictment was vague because it did not identify which codefendant committed each act charged in the indictment, did not allege from where the victim was abducted, and failed to allege the specific acts which established the element of restraint necessary for the kidnapping charge.
*514 Initially, we note Alabama has abolished the distinction between principals and accessories. See § 13A-2-23, Ala.Code 1975. As we stated in Johnson v. State, 612 So.2d 1288, 1297 (Ala.Crim. App.1992):
"Under Alabama law, the distinction between principals and accessories has long been abolished; one charged as a principal may be convicted as an accomplice, and the State is not required to notify the defendant in the indictment or otherwise that it is proceeding under a complicity theory. Hyter v. State, 545 So.2d 194, 197 (Ala.Cr.App.1989); Wallace v. State, 530 So.2d 849, 855-56 (Ala. Cr.App.1987), cert. denied, 530 So.2d 861 (Ala.1988)."
Here, it was not necessary that the indictment indicate which defendant committed each separate act during the commission of the kidnapping-murder. This distinction is irrelevant in Alabama.
Neither was it necessary for the indictment to allege where the act occurred. Section 15-8-31, Ala.Code 1975, states:
"It is not necessary to allege where the offense was committed in an indictment; but it must be proved, on the trial, to have been committed within the jurisdiction of the county in which the indictment is preferred."
See Rule 13.2(d), Ala.R.Crim.P. ("It is not necessary to state the precise time or date at which or on which the offense is alleged to have been committed, or the place where the offense is alleged to have been committed unless the time or place is a material element of the offense."). See also Ruffin v. State, 582 So.2d 1159 (Ala. Crim.App.1991); Lunceford v. City of Northport, 555 So.2d 246 (Ala.Crim.App. 1988). "`[U]nder our system of pleading, indictments are rather a statement of legal conclusions, than of facts.... "[I]t is not required that an indictment set up the proof necessary to a conviction."` Hochman [v. State], 265 Ala. [1] at 3[, 91 So.2d 500 (1956), cert. stricken, 265 Ala. 404, 91 So.2d 502 (Ala.1956)]. Boyd v. State, 3 Ala.App. 178, 181, 57 So. 1019 (1912)." Copeland v. State, 456 So.2d 1150, 1151 (Ala.Crim.App.1984).
Smith was charged with kidnapping in the first degree as defined in § 13A-6-43(a)(4), Ala.Code 1975, that section provides that "(a) A person commits the crime of kidnapping in the first degree if he abducts another person with intent to... (4) [i]nflict physical injury upon him, or to violate or abuse him sexually...." Place is not a material element of kidnapping in the first degree as defined in § 13A-6-43(a)(4).
"`A charge in the language of the statute that the accused had kidnaped his victim for the purpose of robbery in violation of the statute apprises the accused of what he will be expected to meet and of the several punishments prescribed therefor, any one of which, upon conviction, may be imposed upon him.' [People v. Britton,] (6 Cal.2d [1] at pp. 4-5). [56 P.2d 494 at p. 496.] The court pointed out: `It is well settled in this state that an indictment or information need not allege the particular mode or means employed in the commission of an offense, except when of the essence thereof. [Citation.] In other words, particulars as to manner, means, place or circumstances need not in general be added to the statutory definition.'"
People v. Soto, 74 Cal.App.3d 267, 272-73, 141 Cal.Rptr. 343, 346 (1977).
As we have stated, an indictment is sufficient if it tracks the language of the charging statute. The indictment here tracked the language of the capital-murder *515 statute, § 13A-5-40(a)(1), and § 13A-6-43(a)(4). In Hartley v. State, 598 So.2d 2 (Ala.Crim.App.1991), the defendant was indicted for kidnapping under § 13A-5-40(a)(2); the indictment read, "did abduct with intent to use him as a shield or hostage...." We held that this indictment was sufficient because it tracked the language of the statute. We stated:
"The first requirement of an indictment is that it apprise the accused of the nature of the offense. Ex parte Hightower, 443 So.2d 1272, 1273 (Ala.1983). See also Reese [v. State, 456 So.2d 341 (Ala.Crim.App.1982)]. The indictment in the instant case tracks the language of the statute and is sufficient to apprise the appellant of the crime charged. `The indictment is sufficient if it alleges the elements of the statute or words which are equivalent in meaning.' Holder [v. State], 584 So.2d [872] at 879 [(Ala.Crim.App.1991)]."
598 So.2d at 4. There is no requirement that a kidnapping indictment specifically state the method of restraint used against the victim.

B.
Smith also argues that the indictment should have been dismissed because, he says, it was duplicitousit stated that the victim was killed by shooting and/or suffocation and/or being set on fire. "`Duplicity' is the joining of two or more separate offenses in a single count. Capps v. State, 587 So.2d 442, 444 (Ala.Cr.App. 1991)." Dill v. State, 723 So.2d 787, 808 (Ala.Crim.App.1998).
"[W]e find our discussion in Harris v. State, 632 So.2d 503 (Ala.Cr.App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), to be controlling. In Harris, the appellant argued that his indictment for murder made capital because it was done for a pecuniary or other valuable consideration or pursuant to a contract or for hire, was duplicitous and violated his right to a unanimous verdict.... In addressing the validity of the indictment in that case, we quoted the following from Schad v. Arizona, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991):
"`"A way of framing the issue is suggested by analogy. Our cases reflect a long-established rule of the criminal law that an indictment need not specify which overt act, among several named, was the means by which a crime was committed. In Andersen v. United States, 170 U.S. 481 [,18 S.Ct. 689, 42 L.Ed. 1116] (1898), for example, we sustained a murder conviction against the challenge that the indictment on which the verdict was returned was duplicitous in charging that the theft occurred through both shooting and drowning. In holding that `the Government was not required to make the charge in the alternative,' id., at 504 [18 S.Ct. at 694], we explained that it was immaterial whether death was caused by one means or the other. Cf. Borum v. United States, 284 U.S. 596 [52 S.Ct. 205, 76 L.Ed. 513] (1932) (upholding the murder conviction of three co-defendants under a count that failed to specify which of the three did the actual killing); St. Clair v. United States, 154 U.S. 134, 145 [14 S.Ct. 1002, 1006, 38 L.Ed. 936] (1894). This fundamental proposition is embodied in the Federal Rules of Criminal Procedure 7(c)(1), which provides that `it may be alleged in a single count that the means by which the defendant committed the offense are unknown or that the defendant *516 committed it by one or more specified means.'"'
"632 So.2d at 514. We then went on to say:
"`"In effect, the indictment charged, in a single count, alternative methods of proving the same crime. See Sisson v. State, 528 So.2d 1151 (Ala.Cr.App.1987), affirmed, Ex parte State, 528 So.2d 1159 (Ala.1988) (`Section 32-5A-191(a)(1) and (2) are merely two different methods of proving the same offensedriving under the influence.') `When an offense may be committed by different means or with different intents, such means or intents may be alleged in an indictment in the same count in the alternative.' Alabama Code 1975, § 15-8-50. Chappell v. State, 52 Ala. 359, 360-61 (1875), held that in an indictment for common law robbery, the taking of the property from the victim may be charged to have been `against his will, by violence to his person,' or `by putting him in such fear as [to cause him] unwillingly to part with the same' in different counts or in the same count in the alternative."
"`Williams v. State, 538 So.2d 1250, 1252 (Ala.Cr.App.1988). Thus, in Tucker v. State, 537 So.2d 59 (Ala.Cr. App.1988), this court held that an indictment that charged the capital murder of a police officer in alternative language complied with the statutory language of § 13A-6-2(a)(1) and § 13A-5-40(a)(5), Code of Alabama 1975. By statutory definition, the murder of a police officer is made capital when the officer is intentionally killed "while such officer is on duty" or "because of some official or jobrelated act or performance." This court reasoned:
"`"`An apparent purpose of these several provisions [§§ 15-8-50, -51, -52] is to obviate the necessity of a multiplicity of counts, permitting one count to serve the purposes accomplished by several at common law....' Horton v. State, 53 Ala. 488, 492 (1875). The indictment was properly framed to conform with the proof. It charged only one offensecapital murder of a peace officerwhich was committed for one of two reasons: either because the officer was trying to arrest Tucker's stepmother or because the officer was trying to arrest Tucker. This indictment completely satisfied the constitutional requirements of due process. Summers v. State, 348 So.2d 1126, 1132 (Ala.Cr.App.), cert. denied, Ex parte Summers, 348 So.2d 1136 (Ala. 1977), cert. denied, 434 U.S. 1070, 98 S.Ct. 1253, 55 L.Ed.2d 773 (1978). See Davis v. State, 505 So.2d 1303, 1304 (Ala.Cr.App.1987) (operating a motor vehicle `while under the influence of intoxicating liquors or narcotic drugs'); Wilson v. State, 84 Ala. 426, 4 So. 383 (1888) (murder `by striking him in the head ... or by choking him with a piece of ... cord'); King v. State, 137 Ala. 47, 34 So. 683 (1903)(murder `by hitting him or by striking him with a miner's pick, or by stabbing or cutting him with a knife, or with some sharp instrument')."
"`Tucker v. State, supra, at 61.
"`As in Tucker v. State, supra, in the present case, the indictment in the present case charged only one offense capital murder for hirewhich was committed for one of two reasons: either Isaiah Harris was killed pursuant *517 to a contract in order for Louise Harris [the defendant] and Lorenzo McCarter to continue their relationship, or Isaiah Harris was killed pursuant to a contract in order for the perpetrators to secure pecuniary gain, specifically $ 100 paid by Louise Harris and the proceeds of certain insurance policies on the victim's life, which were to be divided among all the participants. Thus, the indictment was not duplicitous."
"632 So.2d at 514-15."
Perkins v. State, [Ms. CR-93-1931, November 19, 1999] ___ So.2d ___, ___ (Ala.Crim.App.1999).
As in Perkins, the indictment in this case charged only one count of capital murderthe murder of Kimberly Brooks during the course of a kidnapping. The indictment listed alternative and conjunctive means of causing her death. The fact that her death was caused by multiple means was supported by the evidence presented at trial through the coroner's testimony. The coroner testified that Brooks died of "shots to the head [and] the chest and possible asphyxiation and burning."

C.
Smith argues that the indictment should have been dismissed because, he says, it was multiplicitous and violated § 15-8-50, Ala.Code 1975. "`Multiplicity is the charging of a single offense in more than one count.' King v. State, 674 So.2d 1381, 1383 (Ala.Cr.App.1995)." Dill v. State, 723 So.2d at 808. Section 15-8-50 states, "When an offense may be committed by different means or with different intents, such means or intents may be alleged in an indictment in the same count in the alternative." (Emphasis added.)
The only difference in the two counts of the indictment was that one count tracked the language of § 13A-6-43(a)(3), kidnapping to accomplish or aid in the commission of a felony, murder, and the other count tracked the language of § 13A-6-43(a)(4), kidnapping by abducting the person to "inflict physical injury upon her, or to violate or abuse her sexually." The two counts were alternative means of proving the capital offense of kidnapping-murder. Section 15-8-50 does not require that alternative methods be contained in the same count in the indictment. This statute uses the permissive word "may." The trial court did not err in failing to dismiss the indictment.

III.
Smith argues that the trial judge denied him a fair and impartial trial because of rulings made during voir dire examination.

A.
Smith first argues that the trial court erred in excusing two prospective jurors without allowing him to question them after the jurors indicated that they were opposed, on religious grounds, to sitting in judgment of others.
The record reflects that during the initial voir dire the trial court asked if there was any reason any prospective juror should be excused from hearing the case. Two prospective jurors indicated that they could not sit in judgment of others because doing so was against their religious beliefs. Defense counsel then objected to the trial court's excusing these prospective jurors without giving defense counsel the opportunity to "probe into the depth of their religious convictions." The trial court denied defense counsel's request.
Section 12-16-6, provides: "It is the duty of the court, before administering the oath prescribed by law to any grand, petit or tales jurors, to ascertain that such juror possesses the qualifications required *518 by law, and the duty required of the court by this section shall be considered imperative." The trial court did not ask about the jurors' religious views but asked if there was any reason, other than those listed in § 12-16-60, why they should be excused from jury service.[4] These two jurors volunteered that their religious beliefs prevented them from passing judgment on others.
This State has not specifically addressed whether a defendant can question a prospective juror about his or her religious beliefs during voir dire examination; however, we agree with the Minnesota Supreme Court:
"Ordinarily at common law, inquiry on voir dire into a jurors' religious affiliation and beliefs is irrelevant and prejudicial, and to ask questions is improper. Questions about religious beliefs are relevant only if pertinent to religious issues involved in the case, or if a religious organization is a party, or if the information is a necessary predicate for a voir dire challenge. Coleman v. United States, 379 A.2d 951, 954 (D.C.1977). See, e.g., United States v. Schullo, 390 F.Supp. 1067 (D.Minn.1975) (Devitt, J.) (in an illegal gambling case, jurors asked by court if they had any moral or religious feelings about gambling so that they could not be fair and impartial). The trial court, in the exercise of its discretion, controls the questions that can be asked to keep the voir dire within relevant bounds. In this case, we do not know how the juror's religious affiliation came to light, but proper questioning for a challenge should be limited to asking jurors if they knew of any reason why they could not sit, if they would have difficulty in following the law as given by the court, or if they would have any difficulty in sitting in judgment."
State v. Davis, 504 N.W.2d 767, 772 (Minn. 1993), cert. denied, 511 U.S. 1115, 114 S.Ct. 2120, 128 L.Ed.2d 679 (1994). When denying certiorari review in the United States Supreme Court, Justice Ginsburg cited with approval the above-referenced language from Davis. Davis v. Minnesota, 511 U.S. 1115, 114 S.Ct. 2120, 128 L.Ed.2d 679 (1994) (Ginsburg, J., concurring). See also State v. Hodge, 248 Conn. 207, 726 A.2d 531 (1998), cert. denied, 528 U.S. 969, 120 S.Ct. 409, 145 L.Ed.2d 319 (1999) (wherein Judge McDonald, in his concurring opinion, cited State v. Davis and Davis v. Minnesota and stated, "In the absence of a religious belief that may directly affect a venireperson's ability to serve on a jury in a particular case, religious beliefs are not relevant to the voir dire process and questions regarding religious beliefs should be disallowed." 248 Conn. at 268, 726 A.2d at 564.)
"`In selecting a jury for a particular case, "the nature, variety, and extent of the questions that should be asked prospective jurors" must be left largely *519 within the sound discretion of the trial court. Peoples v. State, 375 So.2d 561 (Ala.Crim.App.1979). In other words, the scope of the voir dire examination of the jury venire is within the broad discretion of the trial court. Bowens v. State, 54 Ala.App. 491, 309 So.2d 844 (1974), cert. denied, 293 Ala. 746, 309 So.2d 850 (1975); Witherspoon v. State, 356 So.2d 743 (Ala.Crim.App.1978); Ervin v. State, 399 So.2d 894 (Ala.Crim. App.), cert. denied, 399 So.2d 899 (Ala. 1981). It is highly proper for the trial court to conduct the voir dire examination. Witherspoon v. State, supra, and cases cited therein.'

"Bracewell v. State, 447 So.2d 815, 821 (Ala.Cr.App.1983), aff'd, 447 So.2d 827 (Ala.1984), cert. denied, 469 U.S. 980, 105 S.Ct. 382, 83 L.Ed.2d 318."
Hall v. State, [Ms. CR-94-0661, October 1, 1999] ___ So.2d ___, ___ (Ala.Crim.App. 1999). The trial court correctly denied defense counsel's request to question these jurors concerning the extent of their religious beliefs.

B.
Smith argues that the trial court erred in curtailing his voir dire examination of a prospective juror who indicated that the death penalty should be automatically imposed when the State proved beyond a reasonable doubt the elements of capital murder.
Smith's argument is not supported by the record. The record does not reflect that the trial court limited the voir dire examination of this prospective juror. The following occurred:
"The Court: Come on in and have a seat, [D.G.] right in there. That will be just fine.
"All right. I had some good reason for bringing him back in. I believe Mr. Sims [defense counsel] was asking some questions.
"Mr. Sims: [D.G.], you said thatyou indicated that you believe in an eye for an eye?
"[Prospective Juror]: To a certain extent.
"Mr. Sims: That you believed that if he was guilty beyond a reasonable doubt of capital murder that you would automatically invoke the death penalty?
"P.J.: Yes, sir.
"Mr. Sims: That's all we have, Your Honor.
"The Court: I don't believe that that is exactly what he said earlier. Nor is it the reason that we brought him back in here.
"That was my understanding. What wewhat he said earlier was that he would consider the evidence at the guilty stage and then he would consider the evidence at the other stage. So I'm going to let you try again or let the State ask him a few questions.

". . . .
"The Court: All right. Let's go back to the other question. Are you going to automatically vote for a death penalty if he is guilty of the offense?
"P.J.: Depending on the other evidence, what I hear.
"The Court: Depending on what other evidence?
"P.J.: Well, you said there was two stages in the trial. We would hear other evidence that we didn't hear the first time.
"The Court: All right. Anything further?
"Mr. Clark [prosecutor]: No, not from the State.
"Mr. Sims [defense counsel]: No, sir.

*520 "The Court: Okay. You can go out to the big courtroom."
(Emphasis added.)
The trial court did not limit the examination of this prospective juror. Furthermore, the record shows that the trial court did not err in denying the motion to strike this juror for cause based on his views in favor of the death penalty. This juror indicated, on two separate occasions, that he could follow the law as directed by the court and put aside his personal views. As we stated in Davis v. State, 737 So.2d 474, 476 (Ala.Crim.App.1997), rev'd in part on other grounds, 737 So.2d 480 (Ala.), on remand, 737 So.2d 487 (Ala.Crim.App. 1999):
"While the record reflects that C.O. [the prospective juror] indeed expressed his strong support of capital punishment, the record also reflects that during voir dire, C.O. stated that his opinion regarding capital punishment would not affect his ability to be fair and impartial; he also stated that he would have to be sure `without a shadow of a doubt' (R. 562.) before he could vote for the death penalty. Further, after the trial court explained to prospective jurors the nature of the two phases of a capital trial, C.O. stated that he could weigh the aggravating and mitigating circumstances during the sentencing phase; that he would follow the law and the instructions of the trial court; and that he would not automatically vote for the death penalty for an eligible defendant. The trial court did not abuse its discretion in denying the appellant's challenge for cause as to C.O. See Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994)."
(Emphasis in original.)

C.
Smith argues that the trial court erred in denying two of his challenges for cause of jurors who had violated the judge's order to avoid contact with potential witnesses or parties.
The record reflects that during voir dire the court was informed that two prospective jurors had been to the Tallapoosa County jail. The court called these two jurors to the courtroom and questioned them individually about their conduct. Each juror indicated that while they were waiting to be called for voir dire one of the two had gone over to the sheriff's office to register for a permit to carry a pistol. Both indicated that they had talked to a secretary at the office. One of the jurors indicated that an officer recognized them and asked if they were on the jury venire. This juror indicated that he then realized that they had made a mistake. Both also stated that they had not discussed the case with anyone and that going to the sheriff's office would not affect their impartiality. Both apologized to the court. The court then indicated that it would fine the jurors if they made any more similar mistakes. These jurors were eventually struck for cause by defense counsel.
The State cites Weeks v. State, 456 So.2d 395 (Ala.Crim.App.1983), aff'd, 456 So.2d 404 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 324 (1985), and argues that no reversible error occurred here. In Weeks, two State witnesses rode to the courtroom in the same car as two jurors. The Court, finding no reversible error, stated:
"While no one should contend that this course of conduct was proper, we do not find it to be here erroneous. The United States Supreme Court in Smith v. Phillips, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), stated that:
"`Past decisions of this Court demonstrate that the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness *521 of the trial, not the culpability of the prosecutor.
"`These cases demonstrate that due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.'"
456 So.2d at 401. Although the jurors failed to follow the trial court's instructions to have no contact with any law enforcement officers, we do not believe that their conduct constituted reversible error. The trial court thoroughly investigated the incident and determined that Smith had suffered no prejudice.
As we stated in Reynolds v. City of Birmingham, 723 So.2d 822, 825-26 (Ala. Crim.App.1998):
"In Minshew v. State, 594 So.2d 703, 716 (Ala.Cr.App.1991), this Court stated:
"`"Juror misconduct will justify a new trial when it indicates bias or corruption, or when the misconduct affected the verdict, or when from the extraneous facts prejudice may be presumed as a matter of law." Whitten v. Allstate Ins. Co., 447 So.2d 655, 658 (Ala.1984). As a general rule, "[w]here extraneous material [is] introduced into the jury's deliberations,... actual prejudice [must] be shown to work a reversal of the verdict." Nichols v. Seaboard Coastline Ry., 341 So.2d 671, 672 (Ala.1976). However, it is a light burden placed upon the defendant to show prejudice based on misconduct which might have influenced the verdict. Ex parte Troha, 462 So.2d 953, 954 (Ala.1984).'
"Numerous appellate decisions address juror misconduct. Essentially, all of the decisions have expressed the same tenets of law regarding this issue. Some decisions have concluded that the juror misconduct was sufficiently prejudicial to warrant a reversal of the conviction. See Ex parte Potter, 661 So.2d 260, 262 (Ala.1994) (jurors' visit to the scene of the crime to view the width of the street in a criminally negligent homicide case might have affected the jury's verdict, despite testimony to the contrary); Ex parte Troha, 462 So.2d 953 (Ala.1984) (juror's communication with his minister brother requesting scripture references during deliberations in rape defendant's prosecution warranted reversal because the misconduct might have influenced the verdict). Others have not. See Ex parte Dawson, 710 So.2d 472 (Ala.1997) (the Alabama Supreme Court, in reversing this Court's holding, stated that the extraneous information introduced by the juror's improper viewing of the crime scene was beneficial to the defense and, therefore, did not warrant the granting of a new trial); see also Knight v. State, [710 So.2d 511 (Ala.Cr.App.1997)] (defendant failed to present any evidence to support his contention that he was prejudiced by a juror's independent experiment and the subsequent extraneous information because the investigation tended to bolster his theory of defense, rather than prejudice it); Reed v. State, [547 So.2d 594 (Ala.Crim.App.1988)].

*522 "Although the juror's actions in the present case constituted juror misconduct, this misconduct does not warrant reversal of the trial court's decision; the trial court investigated the misconduct and properly found that there was no prejudice to the appellant. Knight v. State, supra at 516, quoting Reed v. State, 547 So.2d 596, 597 (Ala.1989). The jurors in the present case all stated that they were basing their decision on the officers' testimony rather than any statements or allegations coming from the investigating juror. Therefore, because the appellant failed to show that the juror's conduct resulted in prejudice, the trial court's determination is due to be affirmed."
In the present case, the jurors' conduct did not result in reversible error.

D.
Smith argues that the trial court erred in failing to find that he had established a prima facie case of racial discrimination in the composition of the jury after the State struck two black prospective jurors.
The record reflects that before striking the jury the trial court stated:
"Now, under the law of the State of Alabama, I am permitted to require the justification for strikes under Batson [v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986),] as they are made, and I will let you do that. I'm going to require the stating of reasons even though there's not been a prima facie showing of racial bias or gender bias on the part of either side."
Thus, the trial court heard a reason for striking each juror. We have stated:
"`"[O]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Hernandez v. New York, 500 U.S. 352, 358-60, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). Where the challenged party's explanations for its strikes are a part of the record, the appellate court will review those explanations regardless of the manner in which they came into the record. See, e.g., Huntley v. State, 627 So.2d 1013, 1016 (Ala.1992); Jackson v. State, 594 So.2d 1289, 1293 (Ala.Cr.App.1991); Williams v. State, 548 So.2d 501, 504 (Ala.Cr.App.1988), cert. denied, 489 U.S. 1028, 109 S.Ct. 1159, 103 L.Ed.2d 218 (1989). Additionally, "[a] circuit court's ruling in a Batson objection is entitled to great deference and we will reverse a circuit court's Batson findings only if they are `clearly erroneous.'" [Ex parte] Branch, 526 So.2d [609]at 625-26 [(Ala.1987)].'"
Woods v. State, 724 So.2d 40, 44 (Ala.Crim. App.1998), quoting Dallas v. State, 711 So.2d 1101, 1104 (Ala.Crim.App.1997), aff'd, 711 So.2d 1114 (Ala.), cert. denied, 525 U.S. 860, 119 S.Ct. 145, 142 L.Ed.2d 118 (1998).
Thus, we proceed to evaluating the reasons given for striking the two black jurors. The prosecutor stated that M.H. was struck because he and three other jurors indicated that they were opposed to capital punishment. The prosecutor further indicated that the other three jurors were also struck. Prospective juror A.V. was struck because he indicated during voir dire that because he was under financial pressure he did not want to serve on jury duty. These reasons have been found not to violate Batson. A juror's opposition to capital punishment is a sufficiently race-neutral reason to strike a juror. See Woods. Also, striking a juror because there is a concern that he will not *523 devote his attention to the proceedings, in that he indicated his desire not to serve, is a sufficient reason that does not violate Batson. Hall v. State, [Ms. CR-94-0661, October 1, 1999] ___ So.2d ___ (Ala.Crim. App.1999). Also, the record does not reflect any disparate treatment of jurors. Therefore, the record does not support any claim of a Batson violation.

IV.
Smith argues that the trial court erred in denying his motion for a continuance because, he says, he was unable to devote the time to prepare his theory of mitigation and because of the publicity surrounding the case. He contended that more time should have been allowed to pass before the trial was held because of the prejudicial publicity surrounding the case. Kimberly Brooks was murdered in February 1995, Smith was indicted in May 1995, and he was tried in August 1995.
"The trial court has broad discretion in granting a continuance when the basis for the motion is that counsel has not had sufficient time to prepare or to develop his defense. Godfrey v. State, 383 So.2d 575, 577 (Ala.Cr.App.), cert. denied, 383 So.2d 579 (Ala.), cert. denied, 449 U.S. 903, 101 S.Ct. 276, 66 L.Ed.2d 134 (1980), citing Smith v. State, 282 Ala. 268, 210 So.2d 826 (1968). `A motion for a continuance due to a lack of time for adequate preparation is a matter entirely and exclusively within the sound discretion of the trial court and its ruling will not be reversed on appeal absent a ... showing of abuse.' Reynolds v. State, 539 So.2d 428, 429 (Ala.Cr. App.1988), cert. denied, 539 So.2d 428 (Ala.1989). Moreover, `the reversal of a conviction because of the refusal of the trial judge to grant a continuance requires "a positive demonstration of abuse of judicial discretion." Clayton v. State, 45 Ala.App. 127, 129, 226 So.2d 671, 672 (1969).' Beauregard v. State, 372 So.2d 37, 43 (Ala.Cr.App.), writ denied, 372 So.2d 44 (Ala.1979) (emphasis added)."
Loggins v. State, 771 So.2d 1070, 1084 (Ala.Crim.App.1999). The record does not establish any prejudice. Defense counsel presented a thorough penalty-phase defense; there is no doubt, based on the record, that counsel was prepared for that phase of the proceedings.
Furthermore, a motion for a continuance is not the proper remedy to seek relief based on prejudicial pretrial publicity surrounding a casethe proper remedy is to seek for a change of venue. See Rule 10, Ala.R.Crim.P.
There is absolutely no indication that the trial court abused its discretion in denying the motion for a continuance.

V.
Smith argues that the trial court erred in denying his motion to suppress a statement he made to police after being subjected to a truth verification machine/voice stress analysis machine,[5] after being held *524 in custody for eight hours, and after the police failed to readminister his Miranda[6] rights.
Smith filed a motion to suppress the statement; an extensive hearing was held on that motion. The record reflects that on February 23, 1995, police were called to the Wall Street section of Tallassee because of a disturbance involving a large crowd. The victim's mother, Mattie Brooks, had called police earlier that day, to report that her daughter had been missing since the previous day. When police arrived they asked Smith about when he had last seen Brooks. Smith was dating Brooks and was the father of her 14 month old daughter. Smith told police that he had last seen Brooks entering a maroon car on the previous day. Investigators William Hough and Richard Lucas of the Tallapoosa County Sheriff's Department went to Smith's house. Smith's mother invited them in. The investigators asked if Smith would accompany them to the office to answer questions about Brooks's disappearance. This occurred around 8:00 p.m. Hough took Smith to his office, executed a Miranda waiver form, and Smith handwrote a statement. In this statement Smith wrote that he saw Brooks get into a red Beretta automobile and drive away with a black female on the previous day. Smith was allowed to wander around the station, to go to the restroom, to get a soda, or take a walk in the walkway. At around midnight, Smith was introduced to two detectives, Lamar Powell and John Cameron, from Hernando County, Florida, who were in Tallapoosa investigating an unrelated case and who had been asked by the Tallapoosa Sheriffs Department to help with the investigation. Smith executed another Miranda form using the form used in Hernando County, Florida. Cameron had a voice stress analysis machine that he had brought with him from Florida. This machine, he testified, measures different tremors in the voice that occur when one is subjected to stress. Before administering this test Cameron executed a "truth verification release form" that indicated that Smith had voluntarily agreed to take the test. After the test Cameron informed Smith that the results indicated that Smith was not telling the truth. Smith then took another test. Smith indicated that he knew he could not pass this test. Cameron then informed Tallapoosa County law enforcement personnel about what Smith had said. The subject matter of this second test focused more on whether Brooks was alive or dead. After this test Cameron informed Smith that he had failed. Smith was then questioned by Tallapoosa County authorities. He was not threatened or coerced into making a statement. Smith confessed to the kidnapping and murder of Brooks.

A.
Smith initially argues that his statement was involuntary because police confronted him with the results of the voice stress analysis machine. While Alabama has never considered the question of how use of a voice stress analysis machine affects the voluntariness of a confession, the District of Columbia has addressed this issue:
"The Supreme Court has rejected a rule `that the use of polygraph "results" in questioning ... is inherently coercive.' Wyrick v. Fields, 459 U.S. 42, 48, 103 S.Ct. 394, 397, 74 L.Ed.2d 214 (1982). Thus, while undoubtedly `some *525 measure of guile' is used when police tell an accused that his answers to questions monitored by a [computerized voice stress analysis] test are untruthful without also explaining that the test results are not conclusive, this `need not result in [a finding of] involuntariness without some showing that the deception was so fundamentally unfair as to deny due process... or that a promise or threat was made that could induce a false confession.' People v. Sohn, 148 A.D.2d 553, 539 N.Y.S.2d 29, 31 (2 Dept.1989) (citations omitted). See also Johnson v. State, 31 Md.App. 303, 355 A.2d 504, 506-07 (1976). Here the record reveals no circumstances of coercion or trickery that, in combination with the CVSA test, can fairly be said to have overborne appellant's free will and compelled his confession. We agree with the trial court that the government sustained its burden of proving by a preponderance of the evidence, Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 626-27, 30 L.Ed.2d 618 (1972), that the confession was voluntary."
Contee v. United States, 667 A.2d 103, 104-05 (D.C.1995). See also State v. Guillory, 373 So.2d 133 (La.1979).
Cases dealing with the polygraph or lie detector test are analogous because the term "lie detector" has been expanded to include voice stress analysis machines.[7] See Parkin, Lie Detectors: An Expanded Definition, 30 McGeorge L.Rev. 729 (1999). See also Contee v. United States, supra. "`The difference, if any, between the psychological stress evaluation test and a lie detector test is too minor and shadowy to justify a departure from our prior decision....'".
As a New York court noted in People v. Sohn, 539 N.Y.S.2d 29, 148 A.D.2d 553, 556-57 (1989):
"`The use of a polygraph will not, in and of itself, render a confession inadmissible as the product of coercion.... However, the use or misuse of polygraph examination is certainly a factor to be considered in determining whether there was impermissible coercion' (People v. Leonard, [59 A.D.2d 1] at 14-15 [,397 N.Y.S.2d 386 (1977)]). While it could be argued that some measure of guile was employed by Investigator O'Leary, when he told the defendant that in his opinion she wasn't being completely truthful, without explaining to her that the test results were inconclusive, such a stratagem *526 `need not result in involuntariness without some showing that the deception was so fundamentally unfair as to deny due process .... or that a promise or threat was made that could induce a false confession' (see, People v. Tarsia, 50 N.Y.2d 1, 11 [,427 N.Y.S.2d 944, 405 N.E.2d 188 (1980)], supra; People v. Henry, 132 A.D.2d 673, 675 [, 518 N.Y.S.2d 44 (1987)]). We conclude that the conduct on the part of the law enforcement officials herein was not so fundamentally unfair as to deny due process (see, People v. Henry, supra.).
"Moreover, an examination of the circumstances surrounding the confession, i.e., `the duration and conditions of detention, the manifest attitude of the police toward the detainee, the existence of threat or inducement, and the age, physical state and mental state of the detainee'... provides ample support for the hearing court's determination that the defendant's statements were voluntary. This 23-year-old woman neither complained of fatigue nor requested any food, nor was she subjected to any coercive tactics; she chose to waive her rights after being advised of them several times and specifically stated that no one had forced her to take the polygraph test. Thus, the record amply supports the hearing court's conclusion that the defendant's statements were voluntary."
See Johnson v. State, 660 So.2d 637 (Fla. 1995), cert. denied, 517 U.S. 1159, 116 S.Ct. 1550, 134 L.Ed.2d 653 (1996) ("Police are not required to protect detainees from their own unwarranted assumptions, nor are police forbidden to talk about polygraph results with a detainee who has voluntarily taken a lie-detector examination and has validly waived all rights."). See also State v. Harberts, 109 Or.App. 533, 820 P.2d 1366 (1990), review allowed, 313 Or. 209, 830 P.2d 595 (1992), aff'd as modified, 315 Or. 408, 848 P.2d 1187 (1993) (the fact that the defendant may have attributed greater reliability to the polygraph than it perhaps deserved did not render his confession involuntary.)
Smith's statement was not involuntary because he was told that the results of the voice stress analysis test indicated deception.

B.
Smith argues that the statement was inadmissible because he was not readvised of his Miranda rights when he gave his handwritten statement to police at 4:00 a.m.
The record of the suppression hearing is confusing because the hearing was disjointed. Detective Hough testified that, "When [Smith] initially came into my office, I reaffirmed verbally through him that he was still under rights advisement and if he understood his rights and was willing to talk to me, which he acknowledged `yes.'" Also, Detective Hough testified before the jury, on cross-examination, that he had given Smith his Miranda rights at 4:00 a.m. before he had talked with Smith and that Smith had voluntarily waived these rights. However, there are references in the record that Hough did not repeat the Miranda warnings at 4:00 a.m. This Court may consider the evidence at trial as well as the evidence presented at the suppression hearing when ruling on the voluntariness of a confession. "In reviewing a trial court's ruling on a motion to suppress, this Court may consider the evidence adduced both at the suppression hearing and at the trial." Henry v. State, 468 So.2d 896, 899 (Ala.Crim.App.1984), cert. denied, 468 So.2d 902 (Ala.1985).
As we have stated:
"`Once the mandate of Miranda has been complied with at the threshold of *527 the questioning it is not necessary to repeat the warnings at the beginning of each successive interview.' Gibson v. State, 347 So.2d 576, 582 (Ala.Cr.App. 1977). See also Cleckler v. State, 570 So.2d 796 (Ala.Cr.App.1990).
"`An accused may be read the Miranda rights prior to one interrogation but not confess until a later interrogation during which there was no rereading of the Miranda warning. As a general rule, it has been held that Miranda warnings are not required to be given before each separate interrogation of a defendant after an original waiver of the accused's rights has been made. However, if such a long period of time has elapsed between the original Miranda warning and the subsequent confession that it can be said that, under the circumstances, the accused was not impressed with the original reading of his rights in making the ultimate confession, then the confession should be held inadmissible.'
"C. Gamble, McElroy's Alabama Evidence, 201.09 (5th ed.1997) (footnotes omitted). See Phillips v. State, 668 So.2d 881, 883 (Ala.Cr.App.1995)."
Powell v. State, 796 So.2d 404, 414 (Ala. Crim.App.1999).
The record shows that when Smith came to the police station at around 8:30 p.m. he was read his Miranda rights and he waived them. Also, before talking with Florida detectives at around 12:30 a.m., he again executed a waiver-of-rights form.[8] After Smith had finished with the Florida detectives, Detective Hough said that he verbally reaffirmed the Miranda rights and asked Smith if he understood them. Looking at the totality of the circumstances, we conclude that the record indicates that the officers complied with Miranda and that the statement was not involuntary on that basis. See Wyrick v. Fields, 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982).
Moreover, the next day, when asked to answer more questions, after police had discovered Brooks's body, Smith invoked his Miranda rights. Certainly, the record here reflects that police complied with Miranda.

C.
Smith also argues that his statement should have been suppressed because, he says, he was arrested without probable cause; thus, the statement was the "fruit of the poisonous tree." Wong v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
Smith contends that there is no question that he was in custody when he was at the police station and confessed. However, this Court stated in State v. Smith, 715 So.2d 925, 926-27 (Ala.Crim.App.1998):
"`"The United States Supreme Court in California v. Beheler, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) articulated `the standard by which "custody" is to be judged.' Davis [v. Allsbrooks, 778 F.2d 168,], 171 [(4th Cir.1985)]. In its opinion, the Supreme Court stated that `although *528 the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' California v. Beheler, supra, 463 U.S. at 1125, 103 S.Ct. at 3519-20 (quoting [Oregon v.] Mathiason, 429 U.S. [492] at 495, 97 S.Ct. [711] at 714 [50 L.Ed.2d 714 (1977)]). See also Primm [v. State, 473 So.2d 1149] at 1158 [(Ala.Cr.App.1985)].
"`"A determination of `custody' is not based on `the subjective evaluation of the situation by the defendant or the police officers.' Davis, 778 F.2d at 171. Where there has not been a formal arrest (as here), an objective test is used to determine whether the suspect's freedom of action has been restricted by the police in any significant manner. Davis, supra at 171; [(United States v.] Miller, [587 F.Supp. 1296] at 1299 [(W.D.Pa.1984)]; Warrick [v. State, 460 So.2d 320 (Ala. Cr.App.1984)]; Hall [v. State, 399 So.2d 348, 351 (Ala.Cr.App.1981)]). `The only relevant inquiry is how a reasonable man in the suspect's position would have understood his position.' United States v. Jonas, 786 F.2d 1019, 1022 (11th Cir.1986) (quoting Berkemer v. McCarty, 468 U.S. 420 [442-44], 104 S.Ct. 3138, 3152, 82 L.Ed.2d 317 (1984))."'
"Smolder v. State, 671 So.2d 757, 760 (Ala.Cr.App.1995) (quoting Hooks v. State, 534 So.2d 329, 347-48 (Ala.Cr. App.1987)).
"`In order to decide if a suspect is "in custody," the court, looking at the totality of the circumstances, must find that a reasonable person in the accused's position would believe that he or she is not free to leave. Landreth [v. State], 600 So.2d [440] at 444 [(Ala. Cr.App.1992)].'
"`"In deciding whether the questioning of a suspect is `custodial' the following factors should be considered:
"`"`whether the suspect was questioned in familiar or neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint of the suspect, the duration and character of the questioning, how the suspect got to the place of questioning, the language used to summon the suspect, the extent to which the suspect is confronted with evidence of guilt, and the degree of pressure applied to detain the suspect.'"
"`600 So.2d at 444, quoting P.S. v. State, 565 So.2d 1209, 1214 (Ala.Cr. App.1990).'
"Johnson v. State, 673 So.2d 796, 798 (Ala.Cr.App.1995)."
Here, Investigator Richard Lucas with the Tallapoosa County Sheriff's Department testified that officers were called to the Wall Street area about a public disturbance at around 6:00 p.m. on February 23. When they arrived, they found a group of citizens in the street confronting each other over Brooks's disappearance. When police arrived Mrs. Brooks, Kimberly's mother, told them that Smith had telephoned her daughter and asked if she had heard from her daughter that day. Also, Lucas testified that Smith and Sanjay Brooks were identified as the last people to see Brooks on the previous day. Lucas testified that because of the tone of the crowd and because they could not ask Smith questions in the street without the spectators making a disturbance, they *529 asked Smith if he would come with them to the police station to answer questions. Lucas stated that police had no idea that any crime had been committed at this time. Lucas testified as follows:
"We spoke with him for a minute and told him that as far as we could find out, you know, that they were the only ones thator the last ones that saw Kimberly. And, you know, that we were trying to find her and make sure she was all right. And that due to that we couldn'tyou know, the situation, would he mind riding somewhere and talk with us where we could get some information so we could find out where she was at. We stayed in the living room [of Smith's house], front part of the house. And Schriod Smith said, `Yeah, I'll be glad to go with you. Let me get on some clothes or shirt.' And he went back into some part of the house back in the back and stayed a little bit and came back out to where we were at."
Detective Hough testified that once Smith arrived at the police station he was allowed to walk freely in the halls, he was offered sodas, he was asked if he was tired, he was asked if he wanted to take breaks, and he was allowed to use the restroom whenever he wanted. Hough also testified, as well as other officers, that the officers were not even aware that a crime had occurred until Smith confessed to murdering Brooks.
The facts do not support a conclusion that Smith was under arrest when he voluntarily accompanied the officers to the police station.

VI.
Smith argues that the trial court committed reversible error by interrogating one of the State's witnesses and Smith's codefendant, Sanjay Brooks. The following occurred during defense counsel's cross-examination of Brooks:
"Q: [Defense counsel]: Was the purpose of going back that you were going to dispose of the body?
"A: I wasn't.
"Q: You weren't, but you knew that's what they were going back for, didn't you?
"A: I figured it.
"Q: To burn the evidence; is that right?
"A: I didn't know for sure.
"The Court: Let me ask you this. When youdidn't you plead guilty to this offense a few days ago?
"The witness: Yeah.
"The Court: And didn't you at that time have the same difficulty remembering that you had heard them say at the gas station that they were getting that gas to go back down there and burn her up?
"The witness: I didn't hear that.
"The Court: Do you remember that now?
"The witness: I didn't hear them say that they were going back to burn her up.
"The Court: You don't remember saying that now?
"The witness: (No response).
"The Court: Try real hard to remember that. Don't you remember that?
"The witness: Remember it, um-um (negative response). At the gas station?
"The Court: At the gas station. Don't you remember that conversation that you related to me a few days ago?
"The witness: Well, at the gas station the only time I was there was when I put gas in James's car. Corey and James

*530 "The Court: All right, when they put the gas in the car. At any point in time what did they say about the gas that they had?
"The witness: They didn't say right then.
"The Court: You don't remember telling me that when you pleaded guilty to the offense yourself?
"The witness: They didn't say about the gas right then."
Brooks was questioned further on cross-examination, and the Court asked the following questions during that cross-examination:
"The Court: Let me ask you this. That was not the same vehicle that y'all went down there in before, was it?
"The witness: It was James's car.
"The Court: Y'all went down there in a van, a maroon van before?
"The witness: First time.
"The Court: And then this different car was totally different from the one you were down there in before as the one that you're in now?
"The witness: Yes.
"The Court: And you drive up down there, but you're the same person who was down there before, right?
"The witness: Yes.
"The Court: And the other two who were with you were the same people that were there before?
"The witness: Yes.
"The Court: But you're in a very different vehicle?
"The witness: Yes.
"The Court: And it's dark?
"The witness: Yes.
"The Court: Go ahead."
There were no objections made when the two above instances occurred; thus, our review of this argument is under the plain-error rule. Rule 45A, Ala.R.App.P. However, the court also questioned this witness on one other occasion, at which time defense counsel moved for a mistrial. At that time, the following occurred:
"Q: [Defense counsel]: Now, it's true that you all thought that Kim was dead?
"A: Yes.
"Q: And you were going back to dispose of the body, weren't you?
"A: Yes.
"The Court: Did you ask anybody what you had that gasoline for?
"The witness: No.
"The Court: You knew what you had the gasoline for, didn't you?
"The witness: Yeah, I sort of figured it.
"The Court: You sort of figured?
"The witness: Yeah.
"The Court: So y'all were hauling gasoline around in a little plastic bottle, right?
"The witness: In a jug.
"The Court: And you were going you knew you were going back down there where you had just seen somebody get shot twice?
"The witness: Yes.
"The Court: And you knew where you were going?
"The witness: Yes.
"The Court: When was the first time you saw the gun?
"The witness: Well, it was a couple of weeks before that happened.
"The Court: Oh, you had seen the gun a couple of weeks before that at the house, and then you saw it when he got in the van with it?
"The witness: Yeah.
"The Court: So you knew he had a gun going down there?

*531 "The witness: Yeah.
"The Court: And then you just happened to stop to talk with him in this isolated spot down there; is that right?
"The witness: Yes.
"The Court: Just happened to pick a place that's forsaken by everybody, nobody around, and that's when you decided you better talk to Corey about taking her back home?
"The witness: Yes.
"The Court: And you carried him down there knowing that he had gotten in the car and that he had a gun with him then, you saw that gun?
"The witness: Yes.
"The Court: An you take her to an isolated spot and there is where y'all are going to get out to talk about it?
"The witness: Yes.
"The Court: But instead, he gets out and shoots her?
"The witness: Yes.
"The Court: But you didn't have anything to do with that, did you?
"The witness: No.
"[Defense counsel]: May we approach the bench?
"The Court: You may.
"(Bench conference held outside the hearing of the jury)
"[Defense counsel]: Your Honor, we have to move for a mistrial on the basis that the Court's extensive questioning of the witness hasof this critical witness for the Stateis prejudicial to our defendant.
"The Court: Denied.
"(Bench conference concluded; jury present)
"The Court: Will there be further questions from the attorneys?"
On appeal, Smith argues that the trial judge's intervention in questioning his co-defendant denied him a fair and impartial trial. He asserts that the court's questions implied to the jury that there was additional evidence indicating that when they bought the gasoline the defendants intended to burn Ms. Brooks, not to destroy evidence, but to kill her. The State asserts that the record is clear that Brooks's testimony "was neither clear nor forthcoming and was ambiguous," and that the trial court did not err in trying to clear up any ambiguity in his testimony. The State further argues that at Brooks's plea colloquy he testified that when they got the gasoline they were talking about "finishing" off the victim. As noted in the quoted portions above, Sanjay Brooks testified that they got gasoline to destroy the evidence, i.e., the victim's body.
The right of a trial judge to interrogate a witness is specifically provided for in Rule 614(b), Ala.R.Evid.;[9] and Rule 19.2, Ala.R.Crim.P.[10] Rule 19.2(b), states, in part:
"(2) Interrogation by Court. The court may interrogate witnesses, whether called by the court or by a party.

*532 "(3) Objections. Objections to the calling of witnesses by the court or to interrogation by the court may be made at the time the witness is called or interrogation begins; provided, however, that the court shall give counsel an opportunity to make such objections outside the presence of the jury."
Rule 614(b) and Rule 19.2 are identical, although there is a slight difference in the wording.[11]
This Court recently addressed the propriety of a trial court's interrogation of a witness in Ward v. State, [Ms. CR-98-0800, February 4, 2000] ___ So.2d ___, ___ (Ala.Crim.App.2000). We stated in Ward:
"In Coleman v. State, 516 So.2d 871 (Ala.Cr.App.1987), the appellant argued that the trial court had improperly questioned witnesses, thus preventing her from receiving a fair trial. In rejecting that contention, this Court replied:
"`"A trial judge may `pose questions to a witness for the purpose of clarifying the issues for the jury's consideration and to aid in the orderly conduct of the trial process.' Richardson v. State, 403 So.2d 297 (Ala. 1981). `The trial judge has the right to propound such questions to witnesses as may be necessary to elicit certain facts, ...; and it not only is the court's prerogative to so act, but its duty, if the court deems it necessary to elicit proper evidence bearing on the issues.' Rice v. Hill, 278 Ala. 342, 343, 178 So.2d 168, 169 (1965) (citations omitted). "`[W]ith certain exceptions, no rule of law exists which limits the power of a judge in a criminal trial to interrogate a witness during his examination. He may ask any question which either the state or the accused had the right to ask, but which has been omitted, if the answer may be relevant.' Holmes v. State, 22 Ala.App. 373, 115 So. 849 (1928). `The unquestioned province of the court in fact, the solemn and sacred duty of a trial judgeis the development and establishment of the truth, and in this connection it is always permissible for the court, and if it appears necessary for him to do so it is his duty, to propound to witnesses such questions as it is deemed necessary to elicit any relevant and material evidence, without regard to its effect, whether beneficial to the one party or the other.' Brandes v. State, 17 Ala.App. 390, 391, 85 So. 824, 825 (1920)." Timmons v. State, 487 So.2d 975, 981 (Ala.Cr. App.), cert. denied, 487 So.2d 975 (Ala. 1986).'
"Coleman, 516 So.2d at 873. As long as the trial court's questions do not divulge its opinion of the evidence and serve to clarify the testimony of the witness or to bring out additional relevant facts, questioning by the trial court is permissible. See Coleman, 516 So.2d at 873, citing Hardy v. State, 455 So.2d 265 (Ala.Cr. App.1984), and Bradley v. State, 494 So.2d 750 (Ala.Cr.App.1985), affirmed, 494 So.2d 772 (Ala.1986)."
The Advisory Committee's Notes to Rule 614, Ala.R.Evid., state:
"The trial judge may not question a witness in such a way as to indicate partiality for a party or as to indicate the judge's own feelings with regard to *533 the credibility of a witness. To do so is to abandon the proper judicial role, by taking on the profile of an advocate; to do so would be an abuse of discretion and could lead to a reversal on appeal."
See Davis v. State, 647 So.2d 52 (Ala.Crim. App.1994); Lett v. State, 625 So.2d 1192 (Ala.Crim.App.1993).
Because the appellate courts of Alabama have had few occasions to address this issue we have looked to other courts. The Sixth Circuit has recognized that there are three situations in which a trial court may have reason to interject itself into the trial proceedings. See United States v. Dandy, 998 F.2d 1344 (6th Cir.1993), cert. denied, 510 U.S. 1163, 114 S.Ct. 1188, 127 L.Ed.2d 538 (1994).
"First, judicial intervention may be necessary for clarification in a lengthy and complex trial. Second, it may be necessary for clarification where attorneys are unprepared or obstreperous or if the facts are becoming confused and neither side is able to resolve the confusion. Third, judicial intervention may be necessary if a witness is difficult or if the witness's testimony is not credible and the attorney fails to adequately probe the witness or if the witness becomes inadvertently confused."
United States v. Dandy, supra at 1353.[12] See United States v. Jerde, 841 F.2d 818 (8th Cir.1987) ("Although the trial court may interject isolated questions to clarify ambiguities, it `cannot assume the mantle of an advocate and take over the cross-examination for the government to merely emphasize the government's proof or to question the credibility of the defendant.'"). Isaac v. State, 590 N.E.2d 606 (Ind.Ct.App.), opinion adopted in part, vacated in part, 605 N.E.2d 144 (Ind.1992), cert. denied, 508 U.S. 922, 113 S.Ct. 2373, 124 L.Ed.2d 278 (1993) ("When a trial judge undertakes to impeach or discredit, he or she abandons the role of safeguarding the fact-finding process and adopts the role of advocate."). James v. State, 388 So.2d 35 (Fla.Ct.App.1980) (case reversed because the trial court commented, on the defendant's testimony, that it was "the rankest form of hearsay that there is").
The Supreme Court in Kmart Corp. v. Kyles, supra at 576, stated that before a trial judges's interrogation of a witness may warrant reversal, the trial judge must have abused its discretion and the actions must have resulted in the accused's being denied a fair trial. In Wilson v. Anderson, 420 Pa.Super. 169, 174 n. 1, 616 A.2d 34 (1992), a Pennsylvania court stated:
"`"A new trial is required ... only when the trial judge's questioning amounts to an abuse of discretion. Commonwealth v. Elmore, 241 Pa.Superior Ct. 470, 476, 362 A.2d 348, 351 (1976). Because a charge of this nature is of the most serious type, however, `"the record must clearly show prejudice, bias, capricious disbelief or prejudgment"' before an abuse of discretion will be found. Kenworthy v. Burghart, 241 Pa. Superior Ct. 267, 271-72, 361 A.2d 335, 338 (1976)."' quoting Fleck v. Durawood Inc., 365 Pa.Super. 123, 128, 529 A.2d 3, 5-6 (1987)."'"
The trial court erred in its extensive questioning of this witness. However, we do not believe, based on the record in this case, that Smith suffered any prejudice. The error that occurred here was harmless beyond a reasonable doubt based on the overwhelming evidence of Smith's guilt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
*534 Also, the exact facts testified to by Brooks in response to the Court's questioning were contained in Smith's statement and in the testimony of the third codefendant, Shontai Smith. Also, the trial court instructed the jury as follows:
"The judge is not permitted to express his opinion or comment on the effect of evidence presented to you or the credibility of witnesses in this case. Therefore, any ruling, statement, or expression which may have been made by me during the course of this trial is not to be considered by you as any effort on my part to convey to you any feeling or opinion about the facts of this case or the credibility of any witness."
Moreover, the questions asked of this State witness were helpful to the defense not the prosecution. No reversible error occurred here.

VII.
Smith argues that the trial court erred in allowing a prior consistent out-of-court statement by Shontai Smith to be received into evidence.
The record reflects that, during the end of Shontai Smith's testimony, the trial court allowed the prosecution to ask Shontai Smith about a prior consistent statement. Defense counsel objected; the trial court overruled the objection. Another witness was called to testify and several moments later the following occurred:
"The Court: Okay. At this time I need to meet with the attorneys here for a second about a matter. I'm going to let the jury go out for just a minute.
"(Jury not present.)
"The Court: I want to go back for a minute to the ruling that I made about the testimony about what the last witness said to Deputy Lucas. I will be honest with you. I have taken several antihistamines today, and my mind is not as geared up as it was. I really thought that the answer to that question was that he had told it differently at that point in time. And
"[Prosecutor]: No.
"The Court: And so I was apparently mistaken.
"[Prosecutor]: No, you did right.
"The Court: Did he tell it differently?
"[Prosecutor]: Well, the point is that that would be hearsay, and it should not have come in. And I want to tell the jury that at this point in time.
"[Defense counsel]: I think it might have been admissible if it was different.
"The Court: And I just was drawing a blank. I had it confused with the fact that the othersyou know, the general story that was told was quite different from that, and thewhat thatwhat that witness told Deputy Lucas at a different point in time was inadmissible hearsay, and I let it in. I did it inadvertently, and I want to tell them that I did wrong.
"[Defense counsel]: Just so the record is clear, Judge, we don't think the bell can be unrung.
"The Court: I don't think there's that much of a bell to it, and I think it can be unrung, and I'm about to unring it.
". . . .
"(Jury present.)
"The Court: Ladies and gentlemen, I've got a terrible confession to make. Judges make mistakes sometimes, and the best time to straighten it out is right after they do it if they can figure out that's what they've done. If I've got any excuse, it's because I'm taking antihistamines and I don't feel like my mind is working exactly like it ought to. But what I want to go back and revisit for just a minute, I let the previous witness *535 what was the name, Shontai or Sanjay?
"[Prosecutor]: Shontai.
"The Court: Shontai Smith testified about what he told Richard Lucas way back in February. Now, I will be honest with you, I was confused. I've heard things previously, and I thought that he had told a different story at that point in time. And if he had told a different story at that point in time, then my ruling would probably have been correct. But since his testimony was about what he told Richard Lucas, it's the rankest sort of hearsay, and you may not consider it for any purpose whatsoever. I should have sustained the objection on this side. I shouldn't have let it go any further than that and you shouldn't have heard evidence about what he told Richard Lucas. And I was just confused about it, and I want you to beconsider it and just put that out of your minds. Whatever he might have told Richard Lucas back in February, it's not evidence in this case and not to be considered by you for any purpose whatsoever."
Shontai Smith's prior consistent statement to police was not admissible. The trial court realized its error in allowing it and gave the jury a thorough curative instruction. "[T]he admission of illegal evidence, which is subsequently excluded and the jury instructed to disregard such evidence, cures the error, and vitiates the exception reserved to its admission." Smith v. State, 107 Ala. 139, 18 So. 306 (1894). See also Smith v. State, 340 So.2d 84 (Ala.Crim.App.1976); Watson v. Adams, 187 Ala. 490, 65 So. 528 (1914). We believe that any possible error was rendered harmless by the actions of the trial court.

VIII.
Smith argues that the trial court erred in allowing evidence of what, he argues, were vague threats Smith had made against the victim.
The record reflects that Stacey Brown, a friend of the victim, was called to testify and that the State attempted to question her about Smith's threats the summer before the murder in February 1995, to kill the victim. Brown was to testify that she heard Smith tell the victim that, if she ever left him, he would kill her and he also said that if he ever saw her with another man he would kill her. These threats occurred on two separate occasions about a month apart in the summer before the kidnapping-murder. The trial court held a hearing outside the presence of the jury and disallowed this witness's testimony. However, the trial court indicated that the threats might be admissible to rebut evidence presented by the defense. During the cross-examination of this witness, the defense presented evidence about the relationship between Smith and the victim. Brown testified that both Smith and the victim had told her that they loved each other. The prosecution then stated that he thought he had "heard a door swinging open." The trial court agreed with this assessment of the evidence and allowed the State to question Brown about the threats Smith had made to the victim.
The evidence of the threats was admissible to rebut the evidence that the defense presented concerning the loving relationship between Smith and the victim. See Maund v. State, 361 So.2d 1144 (Ala.Crim. App.1978). Moreover, the threats were admissible as evidence of a "design in the accused to injure the victim." C. Gamble, McElroy's Alabama Evidence, § 44.02(1) (5th ed.1996), states:

*536 "In a charge of homicide or assault, a threat by the accused to kill or injure the victim is admissible as tending to show a design in the accused to commit the crime and, hence, as tending to show the accused's commission of the crime. Some courts have held such threats admissible as tending to show malice or intent on the part of the accused. While remoteness is always a basis for excluding evidence in extraordinary circumstances as determined within the discretion of the trial court, the decisions reflect that such a threat is admitted no matter how much time has elapsed between it and the homicide or assault.
"The fact that the accused conditioned a threat to the victim does not affect its admissibility. It has been held that a threat to kill or injure coupled with a condition is admissible even though no evidence is introduced showing fulfillment of the condition."
See also Rule 803(3), Ala.R.Evid.

IX.
Smith argues that the trial court admitted into evidence photographs of the autopsy because Smith would not plead guilty, and that their admission resulted in his being denied a fair trial.
The record reflects that at the start of the second day of trial, the trial court, outside the presence of the jury, told Smith that the evidence that was to be presented that day would be graphic and lurid evidence about the burned body and that the court believed that it would be in Smith's best interest to plead guilty to the crime. The trial court went over the pros and cons of Smith's entering a guilty plea at that time. The court also made it clear that it did not intend to coerce Smith into pleading guilty. Smith then conferred with his attorney and the following occurred:
"At this point in time defense counsel has had an opportunity to confer with his client, the two lawyers have conferred with the client. They've indicated that they feel that they have to go on with the trial. And certainly I respect that decision on their part. There was no intent on my part to coerce a guilty plea. My purposeor to imply that there would be anything wrong with not entering a guilty plea. It was simply to try to clear the air so that defense counsel wouldn't feel tremendous pressure either way in making a decision for whatever they thought was in the best interest of their client."
There is absolutely no evidence in the record that the trial court's rulings on the admissibility of the photographs was based on Smith's decision not to enter a guilty plea. Moreover, the photographs of the crime scene and the victim's injuries were admissible. In Travis v. State, 776 So.2d 819, 869 (Ala.Crim.App.1997), we stated:
"`Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App. 1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr. App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, *537 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App. 1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987)...."
"Ex parte Siebert, 555 So.2d 780, 783 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990)."

X.
Smith argues that the trial court erred in allowing evidence of the public disturbance outside Brooks's home because it demonstrated the impact the victim's death had on her family and thus was not admissible at the guilt phase of his trial.
The record reflects that the victim's mother testified concerning the events surrounding her daughter's murder. She testified that, on the day after Kimberly disappeared, Smith telephoned her and asked if she had seen Kimberly. Mrs. Brooks said that she thought the call was strange because ordinarily Smith would not speak to her on the telephone. Mrs. Brooks then told Smith that she would call the police if he did not tell her where Kimberly was. Smith told Mrs. Brooks that the previous night Kimberly had gotten into a maroon car and left with a black girl. Mrs. Brooks then called the police and went to Smith's house. When she arrived at Smith's house, accompanied by her sisters and friends, she said that there were "maybe 10 or 20" of "Corey's people" standing by the road. She confronted Smith about her daughter and Smith once again said that she had left with a black girl in a maroon car the previous day. There was also evidence that Smith had told Sanjay Brooks that, if anybody asked about Kimberly, he should tell them that a lady in a red car had picked her up at the corner store the night before.
This evidence was admissible because it indicated Smith's consciousness of guilt. As this Court stated in State v. Mason, 675 So.2d 1, 3-4 (Ala.Crim.App.1993):
"`It is well settled that the acts, declarations, and demeanor of an accused before or after the offense, whether a part of the res gestae or not, are admissible against him, but that unless they are a part of the res gestae they are not admissible for him. Smoot v. State, 381 So.2d 668 (Ala.Cr.App.1980). This court has also stated that "any conduct or declaration of a person having relation to the offense he is suspected of or charged with, indicating a consciousness of guilt, is admissible evidence against him." Sparks v. State, 376 So.2d 834, 843 (Ala. Cr.App.1979).'
"See also Knox v. State, 571 So.2d 389 (Ala.Cr.App.1990); Nicks v. State, 521 So.2d 1018 (Ala.Cr.App.1987), aff'd, Ex parte Nicks, 521 So.2d 1035 (1988), Nicks v. Alabama, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988). Additionally, in Magro v. State, 384 So.2d 871, 875 (Ala.Cr.App.), cert. denied, Ex parte Robert Angelo Magro, 384 So.2d 875 (1980), this court held:
"`[A]ny indications of a consciousness of guilt, however minute or insignificant they may be, are admissible against a defendant if they tend to elucidate the transaction. McAdory v. State, 62 Ala. 154 (1878). Generally it is permissible to show the whereabouts *538 of the defendant both prior and subsequent to the commission of the offense to the time of his arrest. Clifton v. State, 359 So.2d 853 (Ala.Cr. App.1978).'
"See also Franklin v. State, 145 Ala. 669, 39 So. 979 (1906) (wherein this court held that `[a] false explanation given by the accused of any suspicious fact or circumstances tending to connect him with the offense is admissible in evidence against him.')"
See also Pressley v. State, 770 So.2d 115 (Ala.Crim.App.1999); Lowe v. State, 627 So.2d 1127 (Ala.Crim.App.1993).

XI.
Smith argues that he was denied a fair trial because certain remarks by the prosecutor in closing argument in the guilt phase of the trial.
"[W]e have repeatedly stated that, `"Statement of counsel in argument to the jury must be viewed as having been made in the heat of the debate, and such statements are usually valued by the jury at their true worth."` Stephens v. State, 580 So.2d 11, 22 (Ala.Cr.App. 1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991), quoting Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr.App. 1988). Moreover, a prosecutor is free to argue his impressions of the evidence. Freeman, supra.
"`"In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981).'

"Callahan v. State, 767 So.2d 380 (Ala. Cr.App.1999). For an argument by counsel to amount to reversible error it must `have so infected the trial with unfairness, taken in the context of the whole trial, that the appellant is entitled to a new trial. See Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).' Holladay v. State, 629 So.2d 673 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994).
"With these principles in mind, we will consider the challenged comments made by the prosecutor in the guilt phase."
Hall v. State, [Ms. CR-94-0661, October 1, 1999] ___ So.2d ___, ___ (Ala.Crim.App. 1999).

A.
The first challenged remark occurred when the prosecutor made the following argument:
"Now, Mr. Sims in his opening admitted, if I understood his statement, he said, `My client did this thing. You know, my client shot Kim Brooks, shot her twice. But he didn't kidnap her. But he didn't kidnap her.' Now, Mr. Sims, Mr. Singleton are advocates for the defendant in this case. They have a job to do. And they're making the best out of a bad situation. But he can't change the facts. He can't change the facts. You know, he knows, he knows that the kidnapping is the trigger to the capital charge in this case.
"[Defense counsel]: We're going to object to what the lawyer knows.
"The Court: Sustained.
"[Defense counsel]: Move to exclude that.
"The Court: Ladies and gentlemen, the lawyers are paid professionals. *539 They do what they have to do to represent their client. And what they think about anything is appropriate of nothing."
Here, there was no adverse ruling from which to appeal. The trial court sustained the objection and issued a curative instruction to the jury. No error occurred here.

B.
Smith argues that the prosecutor erred in its rebuttal closing statement by arguing the following:
"Loophole. Loophole. They look at this case. They know they got problems. The charge is capital murder. We got big problems. There's no way, no way nobody is going to buy we didn't do it. No way nobody is going to buy that after he has told Larry Butler, after he's told Bo Shealey, after two codefendant get up here and tell about his involvement, after we find her burned body in the dump where he said he left her, after we find the gun and match up that gun with the bullets that came out of her head and chest. No way that he can get out of that murder.
"So how can we get out of kidnapping? How can we get out of kidnapping? Because if we can get out of kidnapping, we get out of the capital murder. A technicality. The loophole."
Smith argues that the above argument trivialized his defense by "reducing the elements of capital murder and the burden of proof to a `loophole' and a `technicality.'"
Initially, we note that Smith did not object to this argument at trial. "His failure to object will not bar our review of an issue in a case involving the death penalty. However, it will weigh against any claim of prejudice he may allege. See Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985)." Williams v. State, 795 So.2d 753, 762 (Ala.Cr.App.1999).
The comments in this case did not "so [infect] the trial with unfairness" that Smith should be entitled to a new trial. Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

C.
Smith argues that the prosecutor commented on his failure to testify when he made the following argument:
"You know, he says the sad fact is that all four of them are children. No, not all four of them, because one of them is no longer a child. One of them no longer has a future. Kim is dead. I don't know what happened all day long at her house. I wish I could ask Kim. I wish I could ask Kimberly Brooks. You know, Kim, tell us. Tell us what was going on that day. Kimberly tell us why you stayed there that day. I wish I would. I can't. We're not ever going to know what happened."
After this remark, defense counsel objected and moved for a mistrial, arguing that the prosecutor had commented on Smith's failure to testify. The trial court denied the motion, noting that the references in the argument were not to Smith but to the victim.
"The law governing our review is stated by the Alabama Supreme Court, as follows:
"`In all criminal prosecutions, the accused shall not be compelled to give evidence against himself. Alabama Constitution, Art. 1, § 6.
"`"On the trial of all indictments, complaints or other criminal proceedings, the person on trial shall, at his own request, but not otherwise, be a competent witness, and his failure to make such a request *540 shall not create any presumption against him nor be the subject of comment by counsel. If the district attorney makes any comment concerning the defendant's failure to testify, a new trial must be granted on motion filed within 30 days from entry of the judgment."
"`Ala.Code 1975, § 12-21-220; see also Ex parte Wilson, 571 So.2d 1251, 1261 (Ala.1990); Ex parte Yarber, 375 So.2d 1231, 1233 (Ala.1979); Whitt v. State, 370 So.2d 736, 738-39 (Ala. 1979).
"`Comments by a prosecutor on a defendant's failure to testify are highly prejudicial and harmful, and courts must carefully guard against a violation of a defendant's constitutional right not to testify. Whitt, supra, at 739; Ex parte Williams, 461 So.2d 852, 853 (Ala.1984); see Ex parte Purser, 607 So.2d 301 (Ala.1992). This Court has held that comments by a prosecutor that a jury may possibly take as a reference to the defendant's failure to testify violate Art. I, § 6, of the Alabama Constitution of 1901. Ex parte Land, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996); Ex parte McWilliams, 640 So.2d 1015 (Ala. 1993); Ex parte Wilson, supra; Ex parte Tucker, 454 So.2d 552 (Ala. 1984); Beecher v. State, 294 Ala. 674, 320 So.2d 727 (1975). Additionally, the Fifth and Fourteenth Amendments of the United States Constitution may be violated if the prosecutor comments upon the accused's silence. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); Ex parte Land, supra; Ex parte Wilson, supra. Under federal law, a comment is improper if it was "`"manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."'" United States v. Herring, 955 F.2d 703, 709 (11th Cir.), cert. denied, 506 U.S. 927, 113 S.Ct. 353, 121 L.Ed.2d 267 (1992) (citations omitted); Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984). The federal courts characterize comments as either direct or indirect, and, in either case, hold that an improper comment may not always mandate reversal.
"`Consistent with this reasoning, Alabama law distinguishes direct comments from indirect comments and establishes that a direct comment on the defendant's failure to testify mandates the reversal of the defendant's conviction, if the trial court failed to promptly cure that comment. Whitt v. State, supra; Ex parte Yarber, supra; Ex parte Williams, supra; Ex parte Wilson, supra. On the other hand, "covert," or indirect, comments are construed against the defendant, based upon the literal construction of Ala. Code 1975, § 12-21-220, which created the "virtual identification doctrine." Ex parte Yarber, 375 So.2d at 1234. Thus, in a case in which there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error, there must have been a virtual identification of the defendant as the person who did not become a witness. Ex parte Yarber, 375 So.2d at 1234; Ex parte Williams, supra; Ex parte Wilson, supra; Ex parte Purser, supra. A virtual identification will not exist where the prosecutor's *541 comments were directed toward the fact that the State's evidence was uncontradicted, or had not been denied. See Beecher v. State, 294 Ala. 674, 682, 320 So.2d 727, 734 (1975); Ex parte Williams, supra; Ex parte Purser, supra. Yet, in such circumstances, it becomes important to know whether the defendant alone could have provided the missing evidence.
"`A challenged comment of a prosecutor made during ... arguments must be viewed in the context of the evidence presented in the case and the entire ... arguments made to the juryboth defense counsel's and the prosecutor's. Ex parte Land, supra; Windsor v. State, 683 So.2d 1021, 1023 (Ala.1994); Ex parte Musgrove, 638 So.2d 1360, 1368 (Ala.1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).'
"Ex parte Brooks, 695 So.2d 184, 188-89 (Ala.) (footnotes omitted), cert. denied, 522 U.S. 893, 118 S.Ct. 233, 139 L.Ed.2d 164 (1997), quoted in Ex parte Clark, 728 So.2d 1126, 1130-31 (Ala.1998).
"In United States v. Knowles, 66 F.3d 1146 (11th Cir.1995), cert. denied, 517 U.S. 1149, 116 S.Ct. 1449, 134 L.Ed.2d 568 (1996), more specifically addressing the alternative criteria for a comment to be improperthe comment was (1) manifestly intended to be a comment on the defendant's failure to testify or (2) of such character that the jury would have naturally and necessarily taken it to be a comment on the defendant's failure to testifythe court stated:
"`"The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury necessarily would have done so." [United States v. Swindall, 971 F.2d 1531, 1552 (11th Cir.1992), cert. denied, 510 U.S. 1040, 114 S.Ct. 683, 126 L.Ed.2d 650 ... (1994) (citations omitted) (emphasis in Swindall).] "The defendant bears the burden of establishing the existence of one of the two criteria." [United States v. Muscatell, 42 F.3d 627, 632 (11th Cir.), cert. denied, 515 U.S. 1162, 115 S.Ct. 2617, 132 L.Ed.2d 859 ... (1995).] The comment must be examined in context, in order to evaluate the prosecutor's motive and to discern the impact of the statement. [Id.]'
"66 F.3d at 1163."
Thomas v. State, [Ms. CR-96-0876, December 30, 1999] ___ So.2d ___, ___ (Ala.Crim.App.1999).
A review of the comment and the record of the discussion between the trial court, the prosecutor, and defense counsel indicates that the comment was not a comment on Smith's failure to testify and that no reversible error occurred here.

D.
Smith also argues that the prosecutor committed misconduct when he asked Brooks's mother during the penalty phase where she had met Smith. Brooks's mother responded that she had met Smith when her son was killed. Before trial began, Smith had made a motion in limine to exclude reference to the fact that the victim had had a brother who was killed in an unrelated incident several years before Kimberly's murder. That motion was granted.
When this occurred the trial court sustained defense counsel's objection and gave the following curative instruction to the jury:
"Ladies and gentlemen, the only matter with which you will be concerned in this hearing is weighing aggravating and mitigating circumstances. That is, the things about the defendant that indicate *542 that he should receive a death sentence or life without parole sentence.
"At this point in time, I'm going to exclude from your consideration all the testimony that you heard from the victim's mother for the simple reason that at this point in time, that testimony does not appear to be relevant to any aggravating or mitigating circumstance. And under no circumstances should you allow yourself to be swayed by sympathy or anger or any other emotion in the course of these proceedings.
"Now, specifically, I want to address the matter of her statement about the death of a son. It's my understanding that in a totally unrelated incident, Ms. Brooks lost another child a few years ago. And she mentioned that. That could evoke sympathy. You're not to let that happen. That hasn't got anything to do with this case.
"Let the record show that I'm seeing every juror out there nod their head in the affirmative that they understand that they can't let the personal circumstances, unfortunate as they may be, by Ms. Brooks' loss of a son as well as a daughter affect their deliberations in this matter. This has to do with aggravating and mitigating circumstances about Corey Schriod Smith."
The trial court cured any possible error by the thorough curative instruction. Thomas v. State, 766 So.2d 860 (Ala.Crim.App. 1998). No reversible error occurred here.

XII.
Smith argues that the trial court committed error in excluding evidence in the penalty phase that related to mitigating circumstances surrounding Smith's childhood.

A.
Smith argues that the trial court erred in not allowing Reginald Smith, his brother, to answer the following question, "Could you tell the jury what Emma Forte [Smith's mother] told you about how that scar got on one of her wrist?"
The State objected; the trial court sustained the objection and stated that the answer to this question would call for hearsay and was also irrelevant. Defense counsel argued that the answer to this question was not hearsay but "it's offered as an independent verbal event," to show that Smith's mother had been assaulted by Smith's father.
Smith also argues that the trial court erred in not allowing Jelma Smith,[13] Smith's stepmother, to testify that she had seen her husband take a gun and leave the house. She was not allowed to testify as to what he told her, i.e., that he was going to Emma Forte's house with the gun.
Although Reginald Smith was not permitted to testify about how Smith's mother got the scar on one of her wrists, Emma Forte testified that she had had to take Robert Charles Smith, Smith's father, to court because of his violence towards her, and that one instance involved a gun and one involved a knife and that she had scars on her body because of his treatment of her. Forte also testified that Smith was aware of Robert Smith's violent behavior and was present when he came to her house with a gun. Annie Butler, Smith's aunt, testified that Robert Smith was violent towards Emma Forte and that he had on several occasions pointed a gun at her. Thus, the court's exclusion of the above evidence did not amount to reversible error *543 because it was cumulative of other evidence presented through other witnesses.
"Testimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred. McFarley v. State, 608 So.2d 430, 433 (Ala.Crim. App.1992); Thompson v. State, 527 So.2d 777, 780 (Ala.Crim.App.1988)."
Yeomans v. State, 641 So.2d 1269, 1272 (Ala.Crim.App.1993).

B.
Smith argues that the trial court applied two standards of admissibility of evidence by allowing the State to cross-examine a penalty-phase witness about what he says were prejudicial matters. During the cross-examination of Annie Butler the following occurred:
"Q: [Prosecutor]: ... Now, your son is Larry Butler, Jr.; is that correct?
"A: Yes.
"Q: Okay, So your son is the one that gave the defendant $1.90 to buy gas that was placed in the jug on the night this occurred; is that correct?
"A: Yes.
"Q: Do you know where the defendant went before he went to Carrville Amoco [gasoline service station] to buy the gas?
"A: Do I know?
"[Defense counsel]: I object to that, Judge.
"The Court: Overruled.
"Q: Did you know that the defendant went to Robert Smith's house to get money to buy gas before he went to the Carrville Amoco?
"A: Yes."
Allowing this testimony was not error. This same testimony was elicited in the guilt phase during Larry Butler's testimony; thus, it was cumulative of other evidence already presented.
Smith also argues that this alleged error was compounded when the State was allowed to ask Casbie Forte, Smith's stepfather, if he had refused to talk with investigators. However, each time this question was asked Forte answered in the negative. Thus, there was no prejudicial error. Moreover, a bench conference was held before the State asked Casbie Forte this question. At this conference defense counsel noted, "I would object to that solely because he may have done that [not talked to investigators] based on misadvice or misunderstanding of advice from me." Based on the record, we find no error.

XIII.
Smith argues that the prosecutor committed reversible error on four separate occasions during his closing argument in the penalty phase.

A.
Smith argues that the prosecutor argued evidence unrelated to any statutory aggravating circumstances when he made the following comment:
"And we submit, ladies and gentlemen, respectfully submit, that those facts as proved prove beyond a reasonable doubt that the circumstance that this killing was especially heinous, atrocious, and cruel exists in this case and has been proved beyond a reasonable doubt.
"Now, why recommend a death penalty in this case? I would submit to you and believe and hope that you feel this way at this time and everybody just that this case, this case is at its core different in a fundamental way, different in a fundamental way from other murders. As I said, this is a prolonged *544 and enduring act of killing that took place over a period of hours, the likes of which one seldom, seldom sees. It is a man against a woman, an armed person against an unarmed person."

(Emphasis added.) It is clear after reviewing the arguments that the prosecutor was arguing that this crime was especially heinous, atrocious, or cruel.

B.
Smith next claims that the prosecutor erred in arguing the following concerning the value of the victim's life:
"A recommendation of punishment which fits the crime, a recommendation of death will also reflect an acknowledgement that Kim Brooks's life had some value, too.
"[Defense counsel]: Judge, I object to that and move for a cautionary instruction. That has never been an issue in this case.
"The Court: Overruled.
"Your verdict will in a real way transcend the confines of this courtroom. Your verdict will touch not only the families immediately involved in this case, the Brooks family and the defendant's family, but will touch the hearts of many people outside this courtroom. You know, there are a lot of folks
"[Defense counsel]: Judge, we object to that.
"The Court: I'll sustain that. Ladies and gentlemen, you're to limit yourself in your consideration as to whether the aggravating circumstances outweigh the mitigating circumstances. And what somebody else thinks about it is of no moment. It's your decision to make.
". . . .
"Now, what is punishment on any criminal case? What is it? Initially and at the heart of it, it's punishment for the defendant. But punishment in any criminal caseand capital cases are not different serves two purposes. Punish the defendant and to deter others from committing the crime. To deter others from committing similar acts.
"[Defense counsel]: Your Honor, we object to that.
"The Court: Overruled.
"Now, and I say this to you
"The Court: Ladies and gentlemen, you're to bear in mind that all of this is just closing argument. All of this is just what the lawyers have to say, and I'm going to allow the District Attorney to argue inferences. I'm going to allow the defense attorneys to argue inferences and effect. But your job is to weigh aggravating circumstances and mitigating circumstances in this case."
A prosecutor is allowed to argue victim-impact evidence during the penalty phase of a capital trial. As this Court has stated:
"In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court held that victim-impact evidence was admissible for consideration by the jury at the sentencing phase of a capital murder case. `"[A] prosecutor may present and argue evidence relating to the victim and the impact of the victim's death on the victim's family in the penalty phase of a capital trial."' Hyde v. State, 778 So.2d 199 (Ala.Cr.App.1998), quoting McNair v. State, 653 So.2d 320, 331 (Ala.Cr.App. 1992), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995). The prosecutor may also properly refer to the victim's characteristics at the sentencing stage of a capital case. Payne, 501 U.S. at 824-25 [, 111 S.Ct. 2597]. `The United States Supreme Court's *545 holding in Payne v. Tennessee, "was based in large measure on the premise that this type of evidence related to the harm done by the defendant and, consequently, was a valid consideration in determining punishment to be imposed."` Price v. State, 725 So.2d 1003, 1034 (Ala. Cr.App.1997), aff'd, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999), quoting McNair, 653 So.2d at 331. We have reviewed the prosecutor's allegedly improper remarks about Mrs. Gilliam and conclude that those comments were proper comments about her characteristics. `"The State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered an individual, so too the victim is an individual whose death represents a unique loss to society and, in particular, [to the victim's] family."` Burgess v. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___ (Ala.Cr.App.1998), quoting Payne, 501 U.S. at 825 [, 111 S.Ct. 2597]."
Perkins v. State, [Ms. CR-93-1931, November 19, 1999] ___ So.2d ___, ___ (Ala.Crim.App.1999). Moreover, the trial court in this case instructed the jury that comments of counsel were not evidence.

C.
Smith argues that the prosecutor erred in stating that "the death penalty is society's effort to defend itself from the criminals among us."
As the State argues, this comment was an appeal for law enforcement. We have held that a similar argument was permissible. See Ingram v. State, 779 So.2d 1225, 1267 (Ala.Crim.App.1999) (prosecutor's argument that capital punishment "was a form of `self-defense' and was imposed for the sake of society" was not error).

D.
Smith argues that the prosecutor committed error in assaulting Smith's mercy argument in this rebuttal argument. The following occurred:
"And then I guess the most ironic of all things, `Don't give me the maximum punishment. I have a daughter.' The irony of that. Labreasha is Kimberly's daughter. That was Labreasha's mother. She is the one that gave birth to that little girl. He is the one that took Labreasha's mother away from her. They come and they say, `You know, he is a human being. He is a human being.' `Poor me. Poor me. Feel sorry for me.' He didn't feel sorry for Kim out there that night, did he? He didn't show her mercy."
This comment was permissible. We have held that a prosecutor may comment in kind to an argument made by defense counsel. McNair v. State, 653 So.2d 320 (Ala.Crim.App.1992), on remand, 653 So.2d 343 (Ala.Cr.App.), on remand, 653 So.2d 347 (Ala.Cr.App.1993), on remand, 653 So.2d 351 (Ala.Cr.App.1994), aff'd, 653 So.2d 353 (Ala.1994). Here, the prosecutor was responding to Smith's argument that the jury should show him mercy because he has a daughter. This comment was permissible. McNair v. State, supra.

XIV.
Smith argues that the trial court erred in interrupting his closing argument in the penalty phase of the trial. The following occurred:
"Now, the first thing to notice about the evidence that you heard and all the facts about the 22nd and the 23rd that Mr. Clark [prosecutor] mentioned, marshalled, all of them, all of them, are also relevant to two otherWell, one is 19. *546 The other is 18. And you know who I mean. Because of everything that Mr. Clark said, everything, doesn't just run to this 18-year-old. It runs to the two other people you sawShontai Smith and Sanjay Brooks. But we all know something. We all know something about them that in a million years I wouldn't have dreamed, given the facts that happened on February the 22nd, in Bibb Town. That both of them not only walked off this witness stand and were taken out that door, but some day each and every one of them is going to have a chance to walk out of a prison yard, because we heard their sentences. Each and every one of them who made that trip to Bibb Town. One of them
"The Court: Counsel, I'm not sure that that has anything to do with balancing aggravating and mitigating circumstances.
"[Defense counsel]: Judge, one of the charges is that you may consider the fact that the co-defendants are eligible for parole and are under sentences of life is relevant in engaging the appropriate sentence for this man."
The trial court questioned the admissibility of this evidence and eventually allowed defense counsel to make his argument.
We observe that no objection was made to the court's interruption; thus, we apply a plain-error analysis. Rule 45A, Ala. R.App.P. We do not believe that the court's interruption here resulted in any prejudice to Smith; he was allowed to proceed with this argument.
Later in counsel's argument the trial court interrupted when counsel made the following argument:
"If you decide that deathif you decide to send him to his death, then that will mean that they will put that cap on his head, and they will run seventy-two hundred volts of electricity through his body until he's dead. Now, what he did there's no excuse for. But he comes from a background. And, if any of you have every experienced any domestic problems, you know that
"The Court: Don't invite the jury to put themselves in any way in the place of anybody. That's inappropriate conduct.
"[Defense counsel]: Yes, sir."
There was no objection to this interruption; thus, we apply a plain-error analysis. Rule 45A, Ala.R.App.P. We have held that a trial court commits no error in curtailing an argument by defense counsel that the jurors should put themselves in the defendant's place. See Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).

XV.
Last, as we are required to do by § 13A-5-53, Ala.Code 1975, we will address the propriety of Smith's conviction for capital murder and sentence to death by electrocution. Smith was indicted and convicted of murdering Kimberly Brooks during the course of a kidnapping, an offense defined as capital by § 13A-5-40(a)(1), Ala.Code 1975.
The record reflects that Smith's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(1).
The trial court correctly found that the aggravating circumstances outweighed the mitigating circumstances and mandated that Smith be sentenced to death. The trial court, in a thorough order,[14] found as *547 statutory mitigating evidence that Smith had no significant history of prior criminal activity. He also considered evidence indicating Smith was under the influence of extreme or emotional disturbance because of his "prospective loss or impairment of his relationship with his child"; as to that evidence the court stated:
"[C]ontrary to the contentions of defense counsel, Corey's emotional distress had a great deal more to do with his relationship to Kimberly Brooks than with his daughter, Labreasha. Taken in its entirety, the emotional distress asserted by the defendant has little to recommend it as a mitigator since emotional distress of this type is the fertile and frequent breeding ground for criminal intent. Certainly, such a mitigator has little or no weight when offered to mitigate the aggravating circumstances that attend killing of Kimberly Brooks."
The trial court also found as a statutory mitigating circumstance that Smith was 18 years old at the time of the kidnappingmurder. The trial court also considered all of the evidence introduced at the penalty phase for purposes of nonstatutory mitigating evidence. The trial court considered Smith's upbringingno male figure in his household, his abusive home environment and his relationship with his daughter and the fact that he helped police discover Brooks's body. The court stated:
"The Court has dealt at some length with a discussion of mitigating factors offered by the defendant, which are independent of statutory grounds, since this was the primary focus of the defense presentation at the sentencing phase of the trial. The earnestness and sincerity of the efforts of defense counsel do not convert these facts into mitigating circumstances that outweigh the aggravating circumstances of this case. Although they reflect a certain pathos, they do little to mitigate."
The trial court properly found the existence of two aggravating circumstances, §§ 13A-5-49(4) and 13A-5-49(8): that Smith committed the murder during a kidnapping and that the murder was especially heinous, atrocious, or cruel compared to other capital offenses.
Section 13A-5-53(b)(2) provides that we must independently weigh the aggravating circumstances and the mitigating circumstances to determine the propriety of Smith's sentence of death. After an independent weighing, we are convinced that death is the appropriate sentence for Smith's actions.
Section 13A-5-53(b)(3) provides that we must address whether Smith's sentence is disproportionate or excessive when compared to other penalties imposed in similar capital cases. Smith argues that his sentence is disproportionate because he was 18 years of age at the time of the offense, he had no prior convictions, and his codefendants had pleaded guilty and received life sentences. We addressed this identical issue in McWhorter v. State, 781 So.2d 257, 327 (Ala.Crim.App.1999). In McWhorter, we stated:
"The appellant argues that his death sentence is not proportionate to the sentence of others involved in the present crime. The appellant argues that because he is 18 years of age with no prior record or convictions, and because none of the other codefendants received the death penalty, the death sentence was disproportionate in his case. The appellant cites as this specific disparity the *548 fact Lee Williams, who also participated in planning the killing, was sentenced to life in prison; Daniel Minor, who participated in the shooting of the victim, was sentenced to life in prison; and Marcus Carter, who participated in planning to rob the victim, was never charged with any crime. The appellant failed to object on this ground previously; therefore, this issue must be analyzed pursuant to the plain-error rule. Rule 45A, Ala.R.App.P. `While the sentences received by codefendants must be considered by the Court in determining the appropriateness of a death sentence, they are not controlling.' Woodall v. State, 730 So.2d 627, 652 (Ala.Cr.App. 1997), aff'd in pertinent part, 730 So.2d 652 (Ala.1998) (`although factors to consider, the facts that Woodall's codefendant John Kennon was not convicted of capital murder, and that Freddie Glenn Pope did not receive the death penalty, do not render Woodall's death sentence disproportionate'). See also Hamm v. State, 564 So.2d 453, 464 (Ala.Cr.App. 1989), aff'd, 564 So.2d 469 (Ala.1990) (`although appellant's co-defendant, who was initially charged for the capital offense as well, ultimately received a life sentence for a plea to murder, we are of the opinion that the appellant's sentence of death was none the less appropriate in this case.'). See also Arthur v. State, 711 So.2d 1031, 1096 (Ala.Cr.App.1996), aff'd, 711 So.2d 1097 (Ala.1997) (`The fact that two of the appellant's accomplices were not prosecuted does make his death sentence disproportionate. Similarly, although Judy Wicker, an accomplice, received a life sentence while Arthur received a death sentence, there was no disparity, especially because the appellant was the triggerman and was already serving a life sentence for murdering a family member when he killed the victim.' Id. at 1096-97. (citations omitted))."
Smith's sentence is not disproportionate. The record clearly reflects that Smith was the instigator and principal in carrying out the kidnapping-murder. Smith's conviction is neither disproportionate nor excessive when compared to sentences received in similar capital cases. See Thompson v. State, 542 So.2d 1286 (Ala.Cr.App.1988), aff'd, 542 So.2d 1300 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989) (murder-kidnapping); Neelley v. State, 494 So.2d 669 (Ala.Cr.App.1985), aff'd, 494 So.2d 697 (Ala.1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987) (murder-kidnapping); Heath v. State, 455 So.2d 898 (Ala.Cr.App. 1983), aff'd, 455 So.2d 905 (Ala.1984), aff'd, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) (murder-kidnapping).
Last, we have searched the entire record for any error that may have adversely affected Smith's substantial rights and have found none. Rule 45A, Ala.R.App.P.
Smith's conviction and sentence to death by electrocution are due to be, and are hereby, affirmed.
AFFIRMED.
LONG, P.J., and COBB, BASCHAB, and FRY,[15] JJ., concur.
NOTES
[1] In his pretrial motion to dismiss, Smith argued that his Sixth, Eighth, and Fourteenth Amendment rights were violated by gender discrimination in the selection of the grand jury foreperson in Tallapoosa County.
[2] Though we question the use of such a short period to establish a "pattern" of genderbased discrimination, see Johnson v. State, 416 So.2d 383 (Miss.1982), the record reflects that Smith made attempts to get information concerning the composition of grand juries before spring 1990 but was unsuccessful.
[3] Because Count II of the indictment was dismissed before the case was submitted to the jury we will not consider any argument concerning the sufficiency of this Count of the indictment. "`The charge upon which the conviction rests is the only charge that is subject to appellate review.'" Gagliardi v. State, 695 So.2d 206, 208 (Ala.Crim.App. 1996), quoting McCain v. State, 611 So.2d 1123, 1124 (Ala.Crim.App.1992).
[4] This section states, in part:

"(a) A prospective juror is qualified to serve on a jury if the juror is generally reputed to be honest and intelligent and is esteemed in the community for integrity, good character and sound judgment and also:
"(1) Is a citizen of the United States, has been a resident of the county for more than 12 months and is over the age of 19 years;
"(2) Is able to read, speak, understand and follow instructions given by a judge in the English language;
"(3) Is capable by reason of physical and mental ability to render satisfactory jury service, and is not afflicted with any permanent disease or physical weakness whereby the juror is unfit to discharge the duties of a juror;
"(4) Has not lost the right to vote by conviction for any offense involving moral turpitude."
[5] "The premise on which voice stress analysis is based is that all speech is comprised of two components. The first are fundamental frequencies determined mainly by laryngeal structures. The second are formant frequencies that are produced when air is passed through the vocal tract. Voice stress analysis analysts believe speech also produces an inaudible FM signal, or microtremor, of 8 to 14 Hz. The belief is that this signal's presence is greatest during normal speech and dampened when a person is placed under stress. A voice stress instrument is designed to monitor and display the variance in microtremors as a person responds to specific questions." (Footnote cont'd.)

Palmatier, The Computerized Voice Stress Analyzer, 16 No.4 GP Solo & Small Firm Law. 42 (1999).
[6] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[7] We have held that police may confront an accused with the results of a codefendant's lie detector test. See Freeman v. State, 555 So.2d 196, 203 (Ala.Cr.App.1988), aff'd, 555 So.2d 215 (Ala.Cr.App.1988), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990). In Freeman we stated:

"`Confessions are not rendered inadmissible by reason of having been obtained by propounding to the accused questions assuming his guilt. Curry v. State, 203 Ala. 239, 82 So. 489 (1919); White v. State, 133 Ala. 122, 32 So. 139 (1902).' Twymon v. State, 358 So.2d 1072, 1074 (Ala.Cr.App. 1978). See also Golden v. State, 439 So.2d 813 (Ala.Cr.App.1983) (it is permissible for an officer to tell an appellant during questioning that he has lied). It was also not improper for Officer Cox to inform the appellant of the lab results or the results of Angela Scott's polygraph test. Cf. Gibson v. State, 347 So.2d 576, 582 (Ala.Cr.App.1977) (`mere confrontation with a codefendant's confession cannot be held to be an unfair tactic or unlawfully coercive,' citing Vander Wielen v. State, 47 Ala.App. 108, 251 So.2d 240, cert. denied, 287 Ala. 742, 251 So.2d 246 (1971)); Williams v. State, 461 So.2d 834, 841 (Ala.Cr.App.1983), reversed on other grounds, Ex parte Williams, 461 So.2d 852 (Ala.1984) (`disclosure of incriminating evidence to the accused, United States ex rel. Gorham v. Franzen, 675 F.2d 932, 938 (7th Cir.1982); Moore v. State, 415 So.2d 1210, 1214 (Ala.Cr.App.1982), does not necessarily render a subsequent confession involuntary')."
[8] Smith states in his brief to this Court that the reading of rights by the Florida police was incomplete. However, the record does not support this argument. The rights form indicates that Smith was told, "You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statement." (C.R.1493.)
[9] The Alabama Rules of Evidence were adopted after the trial in this case. Rule 1103 provides that the Rules of Evidence "shall apply if the proceeding begins on or after January 1, 1996." Smith's trial ended before this date.
[10] The Alabama Rules of Criminal Procedure were effective as of January 1, 1991. Also, as the Supreme Court stated in Kmart Corp. v. Kyles, 723 So.2d 572, 576 (Ala.1998): "Rule 614 expresses the law as it existed in Alabama before the adoption of the Rules of Evidence: that it is within the power of the trial court to propound questions to witnesses, and it is the duty of the court to do so if justice requires, so long as the court does not depart from the standard of fairness and impartiality."
[11] Rule 614 states in part:

"(b) Interrogation by Court. The court may interrogate witnesses, whether they were called by the court or by a party.
"(c) Objections. Objections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is not present."
[12] Rule 614, Ala.R.Evid., mirrors Rule 614 of the Federal Rules of Evidence.
[13] Smith indicated in his brief to this Court that this witness's name is misspelled in the record and that her name is spelled "Jemma." However, we have used the spelling contained in the certified record on appeal.
[14] The trial court's order originally set a date for Smith's execution. Smith filed a motion to vacate this part of the order and the trial court granted the motion. (C.R.1313.) Rule 8(d), Ala.R.App.P., provides that the trial court should not set an execution date but the Alabama Supreme Court shall set an execution date at the appropriate time.
[15] Judge Fry was not a member of this Court when oral arguments were held in this case. The tapes of the oral argument have been made available to him.